### MASONITE CORPORATION v. CELOTEX CO.

### No. 871.

District Court, D. Delaware.

Oct. 19, 1932.

Hugh M. Morris, of Wilmington, Del., and Drury W. Cooper, Herbert H. Dyke, and Delos Holden, all of New York City, for plaintiff.

Caleb S. Layton, of Richards, Layton & Finger, of Wilmington, Del., and Henry M. Huxley, and Edward A. Hampson, both of Chicago, Ill., for defendant.

NIELDS, J.

In this patent suit Masonite Corporation charges the Celotex Company with infringement of letters patent 1,663,505 granted March 20, 1928, to William H. Mason on his application filed September 18, 1925. The patent relates to hard, grainless fiber products and the process for making same, and was assigned to plaintiff.

The defenses are (1) noninfringement, and (2) that, if the claims in suit are given a construction broad enough to include either the process used or the product made by defendant, then they are invalid.

Plaintiff manufactures a hard board, designated "Presdwood," under this patent at its plant at Laurel, Miss. Defendant manufactures a hard board at Marrero, near New Orleans, La., called "Celotex Hard Panel Board."

The patent describes the finished product and the raw material from which it is manufactured: "The principal object of the invention" says the patentee, "is the production from natural wood, usually waste pieces from saw mills, of coherent grainless, hard, dense, stiff and strong products having practically all the characteristics of natural wood, but of increased density,.and remade so as to be without grain and free from the weakness which natural wood has 'across the grain.'" The production of wood fiber being the first step, the specification states: "The raw material, such·as wood in small pieces or chips, is first converted into fiber." This conversion is produced by exploding and disrupting the chips from a gun theretofore patented by Mason. Afterwards the fiber is beaten into pulp, rolled into sheets, and dried under heat and pressure. The patentee further describes the product: "Fiber made by explosion as described is particularly well adapted for making a hard, grainless product because the resulting fiber contains practically all the original substance of the wood or woody material in a good state of subdivision," and "is very dense, the density being practically uniform throughout its thickness, has a specific gravity of approximately one, and is resistent to absorption of water, and with addition of size additional resistance to water penetration can be obtained." The patentee attributes "the high degree of homogeneity, hardness, denseness and stiffness to the continuous application of pressure and heat to the fibrous mass softened by moisture and containing all or practically all of the original wood or woody constituents until substantially dry, resulting in what may be termed a thorough cohering, coalescing, bonding or welding together of the component parts of the original wood or woody material."

The claims relied on are product claims Nos. 5, 6, and 26; and process claims Nos. 14, 16, 20, 22, and 23. Claim 5 is fairly typical of the product claims and reads:

"5. An article of manufacture consisting of a coherent, grainless, homogeneous, hard, stiff and strong body of wood or woody material, which had been disintegrated into substantially fibrous state, wet, and dried from moist state under consolidating pressure and heat until practically completely freed from moisture, said body being denser than, and comprising practically all the substance of the original wood or woody material."

Claim 16 is representative of the process claims: "16. The process of making coherent, grainless sheets of wood or woody material which comprises the steps of disintegrating the wood or woody material into substantially fibrous material comprising practically all the substance of the original wood or woody material, soaking said fibrous material with water, forming into sheets and subjecting the sheets of fibrous material to consolidating pressure and heat following up the application of pressure during shrinkage and until practically completely freed from moisture to such extent that the product is not disrupted upon opening the press while still highly heated."

The defendant was incorporated in 1920. Its principal business is the manufacture of products from the waste of sugar mills called "bagasse." Incident to that business, defendant operates several sugar plantations and sugar mills. In the manufacture of sugar the cane is cut and stripped of its leaves. The stalks are cut into pieces usually about·3 feet long and sent to the sugar mill. There it passes through crushers and heavy hydraulic rollers that squeeze out the sugar bearing juice. The cane is substantially fibrated and shredded into short lengths running from very small fibers and pieces a half inch long up to several inches long. This residue is termed "bagasse" and was formerly used for fuel. At this stage it contains about 50 per cent. of water, 45 per cent. of fibrous material, and 5 per cent. of sugar fats, and waxes. Disregarding water it loses about 10 per cent. in weight caused by fermentation of the sugar content and the attack of microorganisms. The bagasse is compressed into bales of about 200 pounds each, and is transported to a storage field where it is stacked until transported to defendant's board mill.

In 1921 defendant started a plant to manufacture insulating board from bagasse. In fibrating, the bagasse goes into a digester where it is subjected to the action of hot water for a period from one to three and one half hours under an average of 45 pounds

pressure. It is then beaten into pulp. The pulp is thoroughly washed to remove the cooking liquor and further refined. Water proofing is added. A certain percentage of beaten waste news print paper is added to the pulp for bonding purposes and the material is pumped to a forming machine where it is further diluted with water and rolled into a wet lap. It forms a sheet 12 feet wide and of continuous length and is placed in a dryer 1,000 feet long. At the end of the dryer the sheets are cut up into pieces of the desired width and length, humidified and ready for shipment. Defendant has sold two hundred to three hundred million square feet of this insulating board a year.

In 1928 defendant began the manufacture of hard board from bagasse. To reduce it to fiber, the bagasse is loaded into a rotary digester. Instead of disrupting the bagasse with hot water, as in the manufacture of insulating board, the bagasse here is cooked in a lime bath at a pressure of about 50 pounds per square inch from two to six hours and converted into pulp. The amount of lime used is in excess of any amount necessary to neutralize the acidity of the bagasse. The percentage of lime, the pressure, and the length of cooking vary with the condition, age, and species of the bagasse. The pulp is then diluted with water, again washed and then placed in a Claflin refiner where the pulp is further refined and hydrated. About 2½ per cent. of scale wax is then added for water proofing. The pulp is then formed into a wet lap. The wet lap containing from 55 to 65 per cent. of water is cut into sheets and fed into a hydraulic press with steam heated platens and subjected to heat and pressure until dry. A wire screen is placed between one face of the sheet and a heated platen to assist in the escape of steam during the drying operation. Pressure is maintained during the shrinkage. After removal from the press the boards are humidified and are ready for shipment.

Having recited the facts, the crucial question arises whether "bagasse" is "wood or woody material" within the meaning of the patent. In other words, what is the proper scope and import of the words "wood and woody material" of the patent. One approach to a proper understanding of these terms is a brief history of the invention. Mason, the patentee, was a construction engineer. He had spent much time in concrete construction work. During the World War he built a shipyard with homes for some 5,-000 people. He experimented with composition board, as a substitute for natural wood, and found it unsatisfactory. After the war he went to Laurel, Miss., to extract naval stores from sawn lumber. He extracted turpentine from boards in dry kilns and improved the prevailing practice by the use of steam. In 1922 the lumber manufacturers acknowledged this contribution to their art. In a year or two the bottom fell out of the naval stores business. Mason was forced into a new line. Having visited sawmills throughout the south he was impressed with the enormous waste involved in burning the chips, edgings, slabs, and short lengths of the lumber. "I thought," he testified, "if there was some way of using the fiber in this waste wood it would be an attractive line to work on." For producing fiber from Southern pine he invented a process and apparatus for converting sawmill waste into fiber by exploding the waste from a gun through a relatively constricted outlet under high steam pressure. He visited manufacturers of insulating board, including the defendant, and a paper manufacturer where he was told by a chemist that his fiber would not make good paper because it contained all the lignins of the wood. Mason turned his thoughts from paper making to the manufacture of board. Having disrupted wood chips to fiber by explosion from his gun, he experimented in his laboratory on the succeeding steps of beating the fiber into pulp, rolling the pulp into sheets, and compressing the sheets with heat and pressure into boards. In the spring of 1925, Mason shipped half a carload of exploded wood fiber to a paper mill in Wisconsin. A number of beating engines were tried out and a Fordrinier machine was made up for forming sheets. A powerful screw press with steam heated platens for paper making was at hand. He used these. On one occasion he placed some wet lap into a press, screwed it down tight, turned off the steam valve intending to shut off the steam and went to lunch. On his return he found to his surprise that the steam had not been turned off by reason of a defective valve and that both heat and pressure instead of pressure alone had been exerted on the lap during the interval. He took out the board and found it both hard and dense. This accidental occurrence satisfied him that heat should be continued while the sheet was being pressed and dried. Returning to Laurel he followed up this lead and fitted up his laboratory letterpress with steam heated platens. By giving the press an extra twist every ten or fifteen minutes, he made the pressure progressive during the heating and dry-

ing operation. He placed a piece of ordinary fly screen on each side of the lap in the press to enable him to eliminate the moisture. Occasionally he used a hydraulic press at the Laurel mill and was able to gauge the pressures and temperatures employed. He testified that pressures of 200 to 600 or 700 pounds "were about the best for making good board. * * * You have to hit the right balance between the two. * * * It is very hard to get rid of the steam when you get up to pressures like 1500 or 2000 pounds." The temperature was about 320° F. In September, 1925, Mason started building his Laurel plant for the manufacture of hard board from Southern pine and filed his application for the patent in suit.

It is apparent that the Mississippi forest and the waste of the sawmills inspired and circumscribed Mason's inventive thought. To save the waste of the sawmills, his thought was to manufacture the fiber from this natural wood into boards. There is nothing in his story to show that he contemplated anything more.

The interpretation of the words "wood or woody material" from Mason's story is further confirmed by the history of his application in the patent office. Plaintiff contends the patent covers all ligno-cellulose materials and justifies this contention by reference to the third line of the patent: "Ligno-cellulose materials, such as wood, and the like are adapted for use in making my improved products." This contention is unsound. The third paragraph in the application as originally filed reads: "Ligno-cellulose materials of various kinds, such as wood, and the like can be used for making my improved products, but for convenience I refer herein especially to wood as a source of material." In this application, "wood, and the like" may have referred to one of various kinds of ligno-cellulose materials. The application was amended. The words "of various kinds" were stricken out. As a result, "wood, and the like" define the character of the material. "Ligno-cellulose materials" are confined by that amendment to "wood, and the like." Further, the words, "wood or woody material" are not in the application or in any of the 16 claims as originally filed. The words "ligno-cellulose product" and "ligno-cellulose material" were stricken out, and the words "wood or woody material" substituted as the definition of the raw material and finished product, except in claims 6 and 26 where the word "wood" alone was substituted.

April 29, 1926, the examiner rejected certain claims citing Shaw 528,612, disclosing a hard board coffin made from straw pulp. In response to this rejection Mason filed on March 16, 1927, an amendment in which he distinguishes his application from the Shaw patent because Shaw made his pulp from straw. July 6, 1927, the applicant filed a supplement to his amendment of March 16, 1927. He rewrote a considerable portion of his specification, canceled all claims, and submitted a new set of claims. The words "wood or woody material" were first introduced into the application and into the claims by this amendment. The applicant again gave his understanding of the Shaw patent in these words: "The teaching of the Shaw patent, as pointed out at the interview, is of making coffin shells of fiber of straw made in the usual manner, which, as is well known, is by treatment with alkaline chemicals, usually lime. Such fiber is not adapted for use in applicant's process and product." Here is a full disclaimer by Mason of the use of straw. Having limited his claims in the patent office to exclude straw, Mason is not now entitled to a construction broad enough to include straw and bagasse. Weber Elec. Co. v. E. H. Freeman Elec. Co., 256 U. S. 668, 41 S. Ct. 600, 65 L. Ed. 1162; I. T. S. Rubber Co. v. Essex Rubber Co., 272 U. S. 429, 47 S. Ct. 136, 71 L. Ed. 335; Smith v. Magic City Kennel Club, 282 U. S. 784, 51 S. Ct. 291, 75 L. Ed. 707. It may be that Mason advanced in the patent office an incorrect theory as to the Shaw patent. The disclaimer, however, stands. The reason for the disclaimer in no way detracts from its effect.

It is unnecessary to discuss the scientific treatises and text-books in evidence. It is sufficient to say that they recognize a clear distinction between wood fibers and fibers from cereals, straws, bamboo, corn stalks, and bagasse. They are so different in their fibrous characteristics that the books classify them under different heads. But a patent is its own dictionary. Whatever may be the technical or scientific meaning of the words "wood or woody material" the court has already found from the patent and its history that the patentee used those words in their ordinary sense to indicate the natural product of the tree. That plaintiff's interpretation of the words "wood and woody material" lead to a reductio ad absurdum

498

was disclosed during the argument. To questions by the court counsel for plaintiff replied that Mason's raw material covered the whole vegetable kingdom.

The conclusions already reached dispose of the case. It is unnecessary to discuss the numerous patents and publications showing the state of the art. It is sufficient briefly to refer to two citations. Assuming that the Mason patent should be stretched to cover bagasse, the patent would be clearly anticipated by Shaw, 528,612, covering a hard board coffin manufactured from straw. Shaw is distinguished from Mason by the use of straw. In Shaw the wet straw is dried and formed into a hard, dense board under heat and pressure. Under a similar assumption the Hartford barrels manufactured from straw and in public use over 50 years ago would invalidate the patent.

Mason's contribution to the art was substantial. It has met with marked commercial success. Mason receives all the patent protection to which he is entitled, however, under a patent limited to a product manufactured from natural wood fibers. Such patent defendant does not infringe.

The bill of complaint must be dismissed.