## UNITED STATES v. MASONITE CORPORATION et al.

District Court, S. D. New York.
Aug. 6, 1941.

Thurman Arnold, Asst. Atty. Gen. (Hugh B. Cox and Samuel S. Isseks, Sp. Assts. to Atty. Gen., and Marcus A. Hollabaugh and Robert C. Barnard, Sp. Attys., both of Washington, D. C., of counsel), for plaintiff.

Breed, Abbott & Morgan, of New York City (Charles H. Tuttle, of New York City, Louis Quarles, of Milwaukee, Wis., Fletcher Lewis, of Chicago, Ill., Herbert H. Dyke, of Laurel, Miss., Thomas E. Kerwin, of New York City, and John M. Coates, of Chicago, Ill., of counsel), for Masonite Corporation.

LeBoeuf, Machold & Lamb, of New York City (Walter F. Kaufman, of Lancaster, Pa., and Horace R. Lamb and Craigh Leonard, both of New York City, of counsel), for Armstrong Cork Co.

Cravath, DeGersdorff, Swaine & Wood, of New York City (Andrew J. Dallstream, of Chicago, Ill., and T. A. Halleran, of New York City, of counsel), for Celotex Corporation.

Hughes, Richards, Hubbard & Ewing, of New York City (Oscar R. Ewing and William T. Gossett, both of New York City, of counsel), for Certain-Teed Products Corporation.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Porter R. Chandler and Taggart Whipple, both of New York City, of counsel), for Johns-Manville Sales Corporation.

Sullivan & Cromwell, of New York City (Allen W. Dulles and William Piel, Jr., both of New York City, of counsel), for Flintkote Co.

Milbank, Tweed & Hope, of New York City (Timothy N. Pfeiffer and Grenville S. Sewall, both of New York City, of counsel), for Insulite Co.

Elmer E. Finck, of Buffalo, N. Y. (Elmer E. Finck, of Buffalo, N. Y., and Henry K. Urion, of New York City, of counsel), for National Gypsum Co.

Lawrence C. Hull, Jr., of New York City (Lawrence C. Hull, Jr., of New York City, and Charles W. Briggs, of St. Paul,

Minn., of counsel), for Dant & Russell, Inc., and Wood Conversion Co.

COXE, District Judge.

This is a suit by the United States to enjoin Masonite Corporation, Celotex Corporation and eight other corporations from further alleged violations of the Sherman and Clayton anti-trust laws, 15 U.S.C.A. §§ 1, 2 & 14.

The complaint charges that in the manufacture and distribution of "hardboard", a synthetic wood product, the defendants have been, and still are, engaged in a conspiracy (1) to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1; and (2) to monopolize trade in violation of Section 2 of the same Act, 15 U.S.C.A. § 2. It is also charged that various agreements between the defendants are in violation of Section 3 of the Clayton Act, 15 U.S.C.A. § 14.

The case was tried largely on agreed facts. These were supplemented by some oral and some stipulated testimony. There is, however, no serious dispute with respect to any of the essential facts.

The principal attack of the Government concerns the alleged violation by the defendants of Section 1 of the Sherman Act, 15 U.S.C.A. § 1.

The term "hardboard" is widely understood to mean the patented product manufactured by Masonite Corporation under the basic Mason patent, No. 1,663,505, issued March 20, 1928; this product is to be distinguished from insulation board, which is a softer board produced in different ways by various manufacturers, and not directly involved in the present litigation.

Hardboard is a homogeneous, hard, dense, grainless fiber board product made from wood or woody material. It is used in the building industry as wall board, for decorative panelling, for exterior covering, for waterproof panelling in kitchens and bathrooms, for flooring and sub-flooring, for ceilings, and for forms into which concrete is poured; in addition, it has found increasing use in other industries, such as the furniture, toy, advertising, pleasure boat, automobile and motion picture industries.

In 1925, Mason, the inventor of hardboard, was instrumental in organizing the Masonite Corporation (then called Mason Fibre Company) to exploit the invention. This corporation established a manufacturing plant at Laurel, Mississippi, and it was there that the first commercial production of hardboard took place in 1926. Since then, the annual production at the Laurel plant has greatly increased the net dollar volume in 1940 amounting to $7,821,797.55.

The Celotex Company (predecessor of the present defendant Celotex Corporation) was, as far back as 1920, a pioneer in the development of structural insulation; it had a large plant at Marrero, Louisiana, where its insulation products and other building materials were manufactured, and it distributed these products through a vast number of local lumber dealers throughout the country.

In or about 1929, the Celotex Company started the manufacture at its Marrero plant of a hard panel board made from bagasse, a sugar cane fiber, which it proceeded to sell in competition with the Masonite hardboard. The Masonite Corporation at once charged the Celotex Company with infringement of a number of its patents, including patent No. 1,663,505, and in 1931 instituted suit against the Celotex Company in the District Court in Delaware for infringement of patent No. 1,663,505. This suit was bitterly contested by the Celotex Company, and resulted in a decision by the Circuit Court of Appeals for the Third Circuit on July 6, 1933, holding two product and four process claims of the patent valid and infringed. Masonite Corporation v. Celotex Co., 66 F.2d 451. The Masonite Corporation was thus left with a final decision adjudicating the validity of a number of basic claims of the patent, and construing these claims with a sufficient breadth to cover the Celotex product made from bagasse.

While the infringement suit was pending, the Celotex Company went into the hands of receivers, and the business was still being conducted by the receivers when the decision of the Circuit Court of Appeals came down on July 6, 1933. The problem then confronting the Celotex receivers was a serious one, for it was realized that if the decision stood, the Celotex Company would be cut off from a supply of hard panel board to round out its line of building products, and it would have to face a large claim by the Masonite Corporation for damages and profits. It was also felt that there was little chance that the decision would be reviewed by the Supreme Court because of the absence of conflicting

rulings in different circuits. See Triplett v. Lowell, 297 U.S. 638, 644, 56 S.Ct. 645, 80 L.Ed. 949.

The problem for the Masonite Corporation was likewise a difficult one even though it had succeeded in the patent litigation; the credit of the company was seriously impaired, the operations at the Laurel plant were almost at a complete standstill, and urgent measures were required to keep the business alive. What the company particularly needed was a larger national distribution of its products, and it was realized that this could only be obtained by securing a much greater number of dealer contacts than the company possessed. Celotex had these contacts, and it was thought that some settlement of existing differences between the two companies might be worked out by which the Celotex dealer contacts would be made available to the Masonite Corporation in the distribution of hardboard products. It was with this mainly in view that negotiations looking to a settlement were opened with the Celotex receivers, and, after considerable discussion, the terms of an agreement were arrived at, which, in effect, accepted the decision of the Circuit Court of Appeals with respect to the patent, released the Celotex Company from any claims of the Masonite Corporation for damages or profits, and constituted the Celotex Company an agent of the Masonite Corporation to sell Masonite hardboard products.

The agreement between the two companies was signed on October 10, 1933; it was executed by one of the Celotex receivers acting under court authority, and on the conclusion of the reorganization proceedings relating to the Celotex Company in 1935, the agreement was assumed by the new Celotex Corporation, one of the present defendants. Similar agency agreements were subsequently executed in 1933 by Masonite Corporation with National Gypsum Company, Johns-Manville Sales Corporation, Armstrong-Newport Company (a subsidiary of Armstrong Cork Company), and Hawaiian Cane Products Ltd. Each of these corporations was engaged in manufacturing and selling building products, and all needed the Masonite patented hardboard to complete their respective selling lines. The remaining defendants (other than the Masonite Corporation) later executed agency agreements with the Masonite Corporation containing terms substantially identical with those of the agreements in force at the time with the other selling agents.

In the operation of the first agency agreements there were minor controversies between the Masonite Corporation and the various agents with respect to the meaning of certain provisions of the agreements, and on Oct. 29, 1936, supplemental agreements were executed with all of the then existing agents clarifying the language on the disputed points. These supplemental agreements did not in any way change the agency relationships created by the earlier agreements, and continued to be operative until after the present suit was started, when an effort was made to remove from the agreements a number of provisions which had been criticised by the Government. This resulted in the preparation of an entirely new agency agreement, which was executed separately by all of the agents, dated March 20, 1941, but which did not actually become effective until April 1, 1941.

The Government insists that these various agency agreements, executed from time to time by the defendants, are not true agency agreements; that they are illegal under the anti-trust laws because they regulate the prices at which hardboard products may be sold by the different agents; and that further operations by the defendants under the agreements should be enjoined.

The critical question is whether the agreements are true agency agreements, for, if they are, it cannot be doubted that the case is controlled by the decision of the Supreme Court in United States v. General Electric Company, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. In the determination of this question, it will be sufficient merely to consider the first Celotex agreement of October 10, 1933, which, in all material respects, is identical with the other early agreements. These early agreements present the case for the Government more favorably than the recent 1941 agreements, and a decision against the Government with respect to them will also dispose of the Government's criticism of the 1941 agreement.

The Celotex 1933 agreement is entitled "Agency Agreement" and refers to the parties as "Manufacturer" and "Agent". The hardboard products, which are the subject of the agreement, are defined as those covered by the Masonite patents. The

agent is appointed "as a del credere factor", and authorized to sell the "hardboard products manufactured" by the manufacturer throughout continental United States and Hawaii. There is a covenant by the agent "to promote the sale of hard boards manufactured by the manufacturer", and one by the manufacturer "to manufacture such of its products", as are shown on an attached exhibit, "in standard sizes therein shown", in such quantities as may be reasonably "required by the agent to enable it to fill its orders". The prices at which the agent is allowed to sell are regulated by the agreement; it is provided that the "manufacturer shall from time to time designate the minimum selling price and maximum terms and conditions of sale at which the agent shall sell manufacturer's products"; these "minimum prices and maximum terms of sale" are required to be the same as the regular list prices and terms of sale from time to time established by the manufacturer for direct sales to its customers, and they cannot be changed except on 10 days previous notice to the agent.

Paragraph 7 of the agreement reads as follows: "The manufacturer agrees to ship hard boards in accordance with the orders and specifications of the agent. Said agent agrees that on direct shipments to the agent said hard boards shall be received and held on consignment, and that the title thereto shall remain in the manufacturer until sold by the agent".

Paragraph 8 provides that within 20 days after the close of the calendar month "in which the order is shipped by the manufacturer" one-half of the difference "between the list price thereof and the agent's discount shall be advanced by the agent", and that the balance shall be paid within 20 days after the close of the calendar month "in which such shipment is made of hard board products sold by the agent to its customers". It is further provided in the paragraph that the agent shall be responsible for and pay "all necessary freight or transportation costs" and "all sales or similar taxes, excises or charges * * * directly levied, imposed or charged * * * in respect of the sale of products sold and distributed by the agent". There is also a provision that the agent shall, at its own expense, "carry adequate insurance against usual hazards covering all products consigned to it", and that "all policies shall, if required by the manufacturer, be payable to the agent and to the manufacturer as their respective interests may appear".

Paragraph 9 specifies the compensation to be paid to the agent "by way of commission on each sale of products sold".

Paragraph 10 provides that the "manufacturer shall not be obligated to manufacture or ship any hard board in a size more than 12' by 4';" the manufacturer will, however, "if indicated by the agent at the time of placing the order, cut each board into not more than two pieces"; the resultant "long" and "short" pieces are to be sold by the agent at the manufacturer's list prices but under certain restrictions.

Paragraph 11 provides that "if the agent or its customers so desire, the manufacturer will, without extra cost, brand or mark all hard boards with such agent's or customer's name or trade-mark or other indicia as may reasonably be requested by the agent". It is also provided that the agent will not use "the trade names 'Masonite' or any of the trade-marks of the manufacturer, including the trade names 'Presdwood', 'Quartrboard', 'Temprtile', and 'Tempered Presdwood'." Under paragraph 12 the manufacturer reserves the right to place patent markings on all hardboard products sold by the agent.

Paragraph 14 reads as follows: "The agent agrees to report on or before the twentieth day following the close of each calendar month to the manufacturer on forms furnished by the manufacturer, giving an inventory of all products consigned to the agent and on hand and unsold at the end of said month in such detail as may reasonably be requested by the manufacturer".

Paragraph 15 allows the manufacturer to terminate the agreement on a default by the agent, or in the event that the agent shall fail to have ordered a stated amount of hardboard products for any six months period, or if the agent shall be adjudicated bankrupt or insolvent or go into receivership. The agreement may, however, be cancelled entirely by the agent on six months written notice to the manufacturer. The concluding clause of the paragraph reads as follows: "In event of termination of this agreement for any reason, the agent shall fully comply up to the date of the termination period and shall at said time purchase and pay for all products consigned to it and unsold, or at the option of the manufacturer shall return all or

so much thereof as it may request. On all goods returned, the manufacturer shall refund to the agent all advances made by the agent to or for the account of the manufacturer in respect of such goods, including freight and reasonable handling charges".

Paragraph 16 reads in part as follows: "The manufacturer shall not be required to accept orders or deliver hardboard products in excess of its manufacturing capacity, it being understood and agreed that the manufacturer is selling hardboard products on its own account as well as through the agent and other agents".

Paragraph 18 permits the manufacturer "from time to time and at any reasonable time, through a firm of certified accountants, to inspect and examine the physical inventory and books and records of the agent relating to any transactions or matters" which are the subject of the agreement.

Paragraph 23 provides that the agreement shall continue during the life of the patent having the longest term to run.

The Celotex 1933 agreement was accompanied by a separate supplemental agreement, also dated October 10, 1933, containing the terms of settlement of the patent litigation involving Patent No. 1,663,505, and providing that if Masonite should make any agency agreement with respect to the sale of hardboard products on terms more favorable to the agent than contained in the Celotex agreement, then Celotex would be entitled to the benefit of such terms.

■ I can find nothing in this 1933 agreement to suggest that it was other than an agreement of true agency; the language is purely that of agency, and it was the unchallenged testimony of all of the witnesses that only an agency relationship was intended. Under the agreement, the agent was appointed "as a del credere factor" to sell hardboard products for the Masonite Corporation; the compensation of the agent was a commission on the sales actually made by the agent. The agent was permitted to carry hardboard products in stock, but it was expressly provided that such stock products should be received and held by the agent on consignment, and that the title thereto should remain in the Masonite Corporation until sold by the agent. These consignment provisions were supplemented by others requiring the agent to make monthly reports to the Masonite Corporation showing the amount of inventory unsold, and permitting the Masonite Corporation from time to time to examine through public accountants the physical inventory, books and records of the agent relating to transactions under the agreement. The provisions regarding payment to the Masonite Corporation by the agent on account of sales made by the agent are the usual provisions of del credere factoring agreements, and are in no way inconsistent with the agency relationship. It is clear, also, that the practice under the agreement squared entirely with its terms; there were no secret or outside understandings between the Masonite Corporation and the different agents, and all parties to the agreement were scrupulous to live up to its various provisions.

■ The Government insists that the agreement was a disguised sales agreement, and points to a number of provisions in support of the contention. It is first said that under the agreement the agent "assumed the incidents and burdens of ownership", the principal references being to the provisions requiring the agent to pay (1) "freight or transportation costs", (2) "sales or similar taxes", and (3) for insurance on consigned products. The answer is that the agent as bailee was free to enlarge its legal responsibility by contract without affecting the agency relationship. Sturm v. Boker, 150 U.S. 312, 14 S.Ct. 99, 37 L.Ed. 1093; In re Columbus Buggy Co., 8 Cir., 143 F. 859. The same point was raised in United States v. General Electric Company, supra, where it was said at page 484 of the opinion in 272 U.S., at page 195 of 47 S.Ct., 71 L.Ed. 362, "The expense of this is of course covered in the amount of his [i. e. the agent's] fixed commission".

■ The other references relied on by the Government on this branch of the case are to the advance payments required of the agent, and the method of handling the sales of "longs" and "shorts". The 1933 agreement provided for an advance by the agent within 20 days after the close of the calendar month in which the order was shipped by the Masonite Corporation. This provision was, however, changed in the 1936 agreement so as to make the requirement for an advance optional with the Masonite Corporation, and it has been stipulated that this option was never exercised as to any of the agents. It is

doubtful, therefore, whether the point has any application, but irrespective of whether it has or not, I am satisfied that an advance by a del credere factor is entirely consistent with an agency relationship. United States v. General Electric Co., supra, 272 U.S. page 484, 47 S.Ct. 192, 71 L. Ed. 362; cf General Electric Co. v. Brower, 9 Cir., 221 F. 597; cf Commercial National Bank v. Heilbronner, 108 N.Y. 439, 15 N.E. 701.

■ The contention of the Government with respect to the provision for handling the sales of "longs" and "shorts" is that if the agent's customer ordered hardboard shorter than standard length, the agent would be required to pay the Masonite Corporation for the entire standard-sized boards. Whether this is the effect of the language of the 1933 agreement is not clear; but in any event it would seem to be a reasonable provision that if the agent specified in its order a smaller size than the standard size mentioned in the agreement, the Masonite Corporation should not be asked to assume the burden of disposing of the remnant. The provision for cutting the standard-sized boards was for the convenience of the agent, and there was a clear right to deal specially with an incidental by-product resulting from the fact that the agent desired to deliver to a customer a board shorter than standard.

■ The Government next asserts that the Masonite Corporation did not attempt to control the conduct of the agents in such a way as to make them true agents. The criticism in this respect is directed largely to the fact that the agents were permitted to sell hardboard under their own trade-marks and trade-names, and that the consigned hardboard was stored by the agents in their own warehouses along with their own products without the posting of signs to indicate that the hardboard belonged to the Masonite Corporation. It is, however, well settled that a factor selling goods on consignment is not required to "advertise the fact of his agency to his customers". Taylor v. Fram, 2 Cir., 252 F. 465, 469; In re Klein, 2 Cir., 3 F.2d 375, 379. Neither is it necessary that the goods be segregated and marked in order to preserve the agency relation; General Electric Co. v. Brower, 9 Cir., 221 F. 597; McCallum v. Bray-Robinson Clothing Co., 6 Cir., 24 F.2d 35; nor that the proceeds from sales be held separately by the factor.

In re Warner-Quinlan Co., 2 Cir., 86 F.2d 103.

■ The contention of the Government that the hardboard was not subject to recall by the Masonite Corporation during the life of the agreement is untenable. There was, it is true, no express provision to that effect, but it was necessarily implied from the fact that the hardboard was held on consignment, and that title thereto remained in the Masonite Corporation until sold by the agent. The whole tenor of the agreement negatives any intention to make sales to the agent. This is particularly emphasized by the language of paragraph 15 which provides that on the termination of the agreement, the agent shall "purchase and pay for all products consigned to it and unsold, or at the option of the manufacturer shall return all or so much thereof as it may request." The solitary use of the word "purchase" in this connection is a recognition that no "purchase" was intended during the time that the agency continued; when it came to an end the parties were in a position to deal with each other as they saw fit. In re Renfro-Wadenstein, 9 Cir., 53 F.2d 834.

I think the 1933 agreement is in all material respects substantially the same as the agreements with the A and B agents in United States v. General Electric Company, supra. There are no doubt some distinguishing characteristics, but these in no way impair the effect of the decision as a controlling authority in the determination of the present case. With respect to the regulation of prices, there is no contention by the Government that the Masonite Corporation does more than determine the price at which its own agents may sell its own hardboard products; it is not even suggested that there is or has been any attempt by the Masonite Corporation, or by any of the agents, to influence or control the price after title has once passed. This was exactly the situation in the General Electric case, which occasioned the following comment from Chief Justice Taft at page 484 of the opinion in 272 U.S., at page 195 of 47 S.Ct., 71 L.Ed. 362: "The agent has no power to deal with the lamps in any way inconsistent with the retained ownership of the lamps by the company. When they are delivered by him to the purchasers, the title passes directly from the company to those purchasers. There is no evidence that any purchaser from the

company or any of its agents is put under any obligation to sell at any price, or to deal with the lamps purchased except as an independent owner."

The question of monopoly raised by the Government is fully answered by the General Electric decision and requires little consideration. The validity of the Mason patent No. 1,663,505 was sustained by the Circuit Court of Appeals in the Third Circuit on July 6, 1933, and the evidence shows that a number of the defendants have been active since then in trying to find a substitute for the patented hardboard which would not infringe. That they have during all this period been unable to make any progress in this direction, is at least a tribute to the merit of the invention. Whatever monoply the Masonite Corporation has in the production and sale of hardboard is derived from the ownership of this Mason patent, and I find nothing in the evidence to show that it has in any respect misused any of its patent rights or violated any of the provisions of the Sherman or Clayton anti-trust laws.

There may be a decree in favor of the defendants dismissing the complaint.