## UNITED STATES *v.* MASONITE CORPORATION ET AL.

No. 723. Argued April 9, 10, 1942.—Decided May 11, 1942.

*Messrs. Hugh B. Cox* and *Assistant Attorney General Arnold,* with whom *Solicitor General Fahy* and *Messrs. Samuel S. Isseks, Archibald Cox, James C. Wilson,* and *Marcus A. Hollabaugh* were on the brief, for the United States.

*Mr. Charles H. Tuttle,* with whom *Messrs. Louis Quarles, Fletcher Lewis,* and *Herbert H. Dyke* were on the

brief, for the Masonite Corporation; *Mr. Andrew J. Dall-stream,* with whom *Messrs. Oscar R. Ewing* and *William T. Gossett* were on the brief, for the Celotex Corporation; *Mr. William Piel, Jr.* was on a brief for the Flintkote Company; *Messrs. Horace R. Lamb* and *Walter F. Kaufman* were on a brief for the Armstrong Cork Company; and *Messrs. John B. Faegre, Timothy N. Pfeiffer, Theodore Kiendl, Elmer E. Finck, Henry K. Urion,* and *Charles W. Briggs* were on a brief for the Insulite Company et al.—appellees.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The question presented by this case is whether appellees have combined to restrain trade or commerce in violation of §§ 1 and 2 of the Sherman Act. 15 U. S. C. §§ 1, 2, 26 Stat. 209. The bill to enjoin the alleged violations of the Act was dismissed by the District Court (40 F. Supp. 852) on the authority of *United States* v. *General Electric Co.,* 272 U. S. 476. The case is here on appeal. 15 U. S. C. § 29, 32 Stat. 823, 36 Stat. 1167; 28 U. S. C. § 345, Judicial Code, § 238.

The appellees are Masonite Corporation, Celotex Corporation, Certain-Teed Products Corporation, Johns-Manville Sales Corporation, Insulite Company, Flintkote Company, National Gypsum Company, Wood Conversion Company, Armstrong Cork Company, and Dant & Russell, Inc. Each is engaged either in manufacturing and selling building materials, or in selling building materials manufactured by others. All maintain selling organizations and to a large extent compete in the same markets. As we shall see, some have competing patents, though others do not. Masonite is a manufacturer and distributor of hardboard. Hardboard—a homogeneous, hard, dense, grainless, synthetic board—is made from wood chips. It has a high tensile strength, low water absorption and a density that ranges from 30 to 60 lbs. per

cubic foot. It is used in the building industry as wall-board, panelling, flooring, ceilings and forms into which concrete is poured. It also has numerous industrial uses. Masonite began its production of hardboard in 1926 and distributed it through its own selling organization. Between March 30, 1926 and March 20, 1928, four patents were issued to it, the claims of which covered both hardboard and the processes for making it. Celotex for some period prior to 1928 had been manufacturing and selling insulation board—a fibre board which has a density of less than 30 lbs. per cubic foot and which is softer and lighter, has a lower tensile strength, and is less resistant to water than hardboard. In 1928, Celotex announced that it intended to begin the manufacture of hardboard from bagasse, a waste product from the grinding of sugar cane. It began production in 1929. Several patents were issued to it. Late in 1928, Masonite notified Celotex that its hardboard infringed Masonite's patents. Various discussions were had with a view of avoiding patent litigation by entering into a cross-licensing agreement. Masonite refused. Celotex continued to manufacture and sell hardboard. Its production increased from about 800,000 square feet in 1929 to about 12,000,000 square feet in 1933. It sold its product in competition with Masonite's hardboard and marketed it at prices lower than Masonite sold its hardboard. In 1931, Masonite instituted suit against Celotex for infringement of one of its patents. The District Court held Masonite's patent valid but not infringed. 1 F. Supp. 494. Masonite appealed. The Circuit Court of Appeals held that Masonite's patent was both valid and infringed. 66 F. 2d 451. A petition for a writ of certiorari was filed in this Court in September, 1933. About that time Masonite renewed negotiations with Celotex. Those negotiations resulted in a settlement of the patent litigation and in the execution of the so-called

"agency" agreement of October 10, 1933[1]—one of the agreements which is here attacked and which we discuss later.

Shortly after the decision of the Circuit Court of Appeals in the patent litigation between Celotex and Masonite, the latter company sent the same proposed "agency" agreement which it had worked out with Celotex to various of the appellees. Johns-Manville Sales Corporation, National Gypsum Company, Armstrong Newport Company (predecessor of Armstrong Cork Company), Hawaiian Cane Products Ltd. (assignor of Certain-Teed Products Corporation), and Wood Conversion Company each executed identical agreements with Masonite on various dates between October 31, 1933 and June 25, 1934. As each agreement was made, Masonite informed the other party of the existence and terms of each of the agreements which Masonite had previously made with the others. And as each contract was executed, Masonite sent copies to the companies which had previously executed similar contracts.

Insulite, a manufacturer of insulation board, began producing hardboard in 1930. Its production rose from about 4,500,000 square feet in 1932 to about 9,000,000 square feet in 1933, and amounted to over 7,000,000 square feet annually in 1934 and 1935. There was some evidence that it was selling hardboard at prices lower than those of Masonite. It was advised by Masonite in July, 1933, of possible legal action if it continued to manufacture and sell hardboard. It received from Masonite a copy of the proposed "agency" agreement. It formally advised Ma-

---

[1] In 1932, receivers for Celotex were appointed by the United States District Court for the District of Delaware and an ancillary receiver was appointed by the United States District Court for the Northern District of Illinois. The agreement with Masonite was authorized by those courts.

sonite of its refusal to enter into any such agreement in December, 1933. In March, 1934, Masonite filed suit against a dealer who handled Insulite's hardboard charging infringement of one of Masonite's patents. Insulite undertook the defense; but, before issue was joined, negotiations between Insulite and Masonite resulted in the execution in February, 1935 of a so-called "agency" agreement substantially identical with the agreement between Masonite and Celotex.[2] At that time, Insulite knew that Masonite and the other companies had previously executed the other agreements.

Disputes arose between Masonite and the so-called "agents" concerning the operation and construction of the "agency" agreements. As a result, the agreements were modified in 1936. Each agreement when executed in 1936 was placed in escrow. The escrow agreement was signed by each of the companies and included the name of each of the other "agents." Each "agent" knew at that time that Masonite proposed to make substantially identical agreements with the others. The escrow agreement provided that it should become effective only when all the "agents" had agreed to it. The new agreements became effective October 29, 1936. In 1937, Flintkote Company and Dant & Russell, Inc. entered into identical agreements with Masonite. Though their agreements differed somewhat from the 1936 agreements, they were substantially similar for present purposes. Both companies knew, when they signed the contracts, that similar "agency" agreements existed between Masonite and the other appellees.

By each of the 1933 agreements, Masonite designated the other party as an "agent" and appointed it as a *"del*

---

[2] At the time Insulite entered into this agreement with Masonite, its parent company was in receivership in the United States District Court for the District of Minnesota. The receivership court authorized Insulite to execute the agreement with Masonite.

*credere* factor" to sell Masonite's hardboard products. The "agent" expressly acknowledged the validity of Masonite's hardboard patents so long as the agreement remained in force. The "agent" agreed to promote the sale of Masonite hardboards. Masonite agreed to manufacture designated hardboard products in specified sizes and to ship on orders and specifications from the "agent" to any place within the continental United States or Hawaii. Masonite agreed to designate from time to time the minimum selling price and the maximum terms and conditions of sale at which the "agent" might sell Masonite's products. The list prices and terms of sale were to be the minimum prices and maximum terms of sale at which Masonite was either offering or making sales to its customers. The right to change the list prices and terms of sale was vested solely in Masonite and might be exercised on 10 days' notice. It was agreed that Masonite was bound to adhere to the prices, and terms and conditions of sale which it fixed for its "agents." In case the "agent" sold for less than the minimum price, it was obligated to pay liquidated damages at a specified rate. On direct shipments to the "agent," the hardboards "shall be received and held on consignment" and "title thereto shall remain" in Masonite until sold by the "agent." The minimum prices were f. o. b. Masonite's factory, the "agent" paying freight and transportation costs, and sales and other taxes. The "agent" also agreed at its expense to carry insurance on all products consigned to it. The "agent's" compensation was fixed by way of specified commissions on each sale. The "agent" was prohibited from making sales (except for off-sized boards) to any person other than specified classes. Those provisions permitted the "agent" to sell only to the construction industry, the industrial market being reserved for Masonite. The "agent" agreed to compensate Masonite by advancing one-half of the difference between the list price and the agent's discount within 20

days after the close of the month in which the order was shipped, and the balance within 20 days after the close of the month in which the products were sold by the "agent" to its customers. In case of direct shipments by Masonite to the customers of the "agent," the latter agreed to pay the entire amount due Masonite within 20 days after the close of the month in which the shipment was made. The "agent" agreed not to use the trade name or the trade marks of Masonite. But the latter agreed to mark, without extra cost, all hardboard with the "agent's" or its customer's name or trade mark, if the "agent" or customers so desired. And Masonite reserved the right to mark all products sold by the "agent" with Masonite's patent notice. Masonite warranted that the products were to be "good, workmanlike products of a character and quality equal to that currently manufactured by it and sold to its customers." Its liability was to be limited to replacing, without cost to the "agent," any "defective material when the defect is one of manufacture." The "agent" agreed to make monthly reports on inventory consigned and on hand. For any default of the "agent," Masonite could terminate the arrangement on 30 days' notice. Masonite could also terminate in case of the bankruptcy, receivership, or insolvency of the "agent," or in case the "agent" failed to order from Masonite at least 1,500,000 square feet of hardboard products for any six months' period. The "agent" could terminate the agreement on six months' written notice. On termination of the agreement, the "agent" agreed to "purchase and pay for all products consigned to it and unsold"; or, at the option of Masonite, the latter might have the products returned to it and refund to the "agent" all advances made by the "agent" to or for Masonite's account. Masonite agreed to issue to the "agent" at its request "a license to manufacture and sell hard boards" under its patents on specified terms and conditions and on payment of designated sums—$200,000 if

the license was issued before December 31, 1934, and decreasing amounts if the license was issued at subsequent dates. Masonite reserved the right to inspect and examine, through certified public accountants, the physical inventory and the books and records of the "agent" relating to the transactions covered by the agreement. Masonite agreed to save harmless and protect the "agent" and its customers against any claim that the hardboards infringed any patent owned by others than the parties to the agreement. Provisions for arbitration and for assignment of the agreement were included. And it was provided that the agreement should continue "during the life of that one" of specified patents of Masonite "having the longest term to run, including any reissues, extensions or improvements thereof," unless the agreement was sooner terminated by either party. Each agreement had attached a form of "license" to manufacture and sell, to be used in case the option license was exercised.[3]

---

[3] There were in some cases supplemental agreements. Thus, Celotex agreed to withdraw its petition for a writ of certiorari in this Court, Masonite waived an accounting in connection with that infringement suit, and each of the parties agreed to pay its own costs and expenses incurred in that litigation. In the case of Insulite, Masonite agreed to dismiss the patent suit which it had instituted against one of Insulite's dealers, without prejudice to the patent claims of either party. Masonite also agreed to purchase a press from Insulite, and to lease that press to Insulite on condition that any hardboard made with it should be of the type theretofore manufactured by Insulite and should not be marketed except "by sale for export only." Masonite could terminate Insulite's right to manufacture for export by offering to sell Insulite hardboard for that purpose. This agreement was without prejudice to Masonite's rights or the rights of its foreign licensees under Masonite's foreign patents.

In 1937, both Insulite and Masonite had applications for patents relating to hardboard pending in the Patent Office. Certain claims of these applications were involved in interference proceedings. Masonite was contending that Insulite was infringing its patents in Finland. By contract, the interference proceedings were settled, in 1938, by Masonite conceding priority to certain patent claims of Insulite and

We need not stop to analyze the 1936 agreements. They contained numerous changes and elaborations. But they are not important for the purposes of this case, since the pattern of the relationship between appellees was fixed in 1933 and its fundamental characteristics were maintained, not basically altered, in 1936. Nor need we stop to explore all of the contentions made by the United States. They include arguments that there has been an illegal division of markets (*Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211); that the "agency" agreements have been used to control unlawfully other materials sold in combination with hardboard, the subject matter of Masonite's patents (*Carbice Corp.* v. *American Patents Dev. Corp.,* 283 U. S. 27); that, in some instances, the combination unlawfully controlled the price of hardboard "owned" by the "agents" (*Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436); and that the arrangement included agreements to suppress the use of patents, contrary to the rule of *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20, and *Standard Oil Co.* v. *United States,* 283 U. S. 163, 174. But we can put these contentions to one side without expressing an opinion on them. For there is one phase of the case which is decisive. That is the agreement for price-fixing.

But for Masonite's patents and the *del credere* agency agreements, there can be no doubt that this is a price-fixing combination which is illegal *per se* under the Sherman Act. *United States* v. *Trenton Potteries Co.,* 273 U. S. 392; *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436; *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150. That is true though the District Court found that,

by Insulite giving Masonite an exclusive royalty-free license under all of Insulite's patents and patent applications relating to hardboard. The license excluded Insulite from using the patents. The alleged infringement of the Finnish patents was settled by Masonite assigning its Finnish patents to Insulite.

in negotiating and entering into the first agreements, each appellee, other than Masonite, acted independently of the others, negotiated only with Masonite, desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that Masonite make such an agreement with any of the others, and had no discussions with any of the others. It is not clear at what precise point of time each appellee became aware of the fact that its contract was not an isolated transaction but part of a larger arrangement. But it is clear that, as the arrangement continued, each became familiar with its purpose and scope. Here, as in *Interstate Circuit, Inc.* v. *United States,* 306 U. S. 208, 226, "It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." The circumstances surrounding the making of the 1936 agreements and the joinder in 1937 of the two other companies leave no room for doubt that all had an awareness of the general scope and purpose of the undertaking. As this Court stated in the *Interstate Circuit* case (p. 227) : "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. . . . Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." And as respects statements of various appellees that they did not intend to join a combination or to fix prices, we need only say that they "must be held to have intended the necessary and direct consequences of their acts and cannot be heard to say the contrary." *United States* v. *Patten,* 226 U. S. 525, 543. Nor can the fact that Masonite alone fixed the prices, and that the other appellees never consulted with Mason-

ite concerning them, make the combination any the less illegal. Prices are fixed when they are agreed upon. *United States* v. *Socony-Vacuum Oil Co., supra,* p. 222. The fixing of prices by one member of a group, pursuant to express delegation, acquiescence, or understanding, is just as illegal as the fixing of prices by direct, joint action. *Id.* Since there was price-fixing, the fact that there were business reasons which made the arrangements desirable to the appellees, the fact that the effect of the combination may have been to increase the distribution of hardboard, without increase of price to the consumer, or even to promote competition between dealers, or the fact that from other points of view the arrangements might be deemed to have desirable consequences would be no more a legal justification for price-fixing than were the "competitive evils" in the *Socony-Vacuum* case.

But it is urged that the arrangement is saved from the Sherman Act by the *General Electric* case. The District Court so held, as we have noted. In that connection, the District Court found that Masonite's patents on hardboard were "fundamental and basic," that there was no monopoly or restraint other than the monopoly or restraint granted by the patents, that the parties had an honest and sincere intent to recognize and exercise the rights belonging to Masonite under its patents, and that the agreements constituted a "true agency" to carry out that purpose. We assume *arguendo* that the patents in question, owned by Masonite, are valid. But we do not agree that the "agency" device saved the arrangement from the Sherman Act.

*Del credere* agency has an ancient lineage and has been put to numerous business and mercantile uses. Chorley, *Del Credere,* 45 Law Quarterly Rev. 221; Mechem, Agency (2d ed.) ch. IV. But, however useful it may be in allocating risks between the parties and determining their rights *inter se,* its terms do not necessarily control

when the rights of others intervene, whether they be creditors or the sovereign. See Klaus, Sale, Agency and Price Maintenance, 28 Col. L. Rev. 441, 443–450. We assume in this case that the agreements constituted the appellees as *del credere* agents of Masonite. But that circumstance does not prevent the arrangement from running afoul of the Sherman Act. The owner of a patent cannot extend his statutory grant by contract or agreement. A patent affords no immunity for a monopoly not fairly or plainly within the grant. We have recently stated in *Morton Salt Co.* v. *Suppiger Co.,* 314 U. S. 488, 492, that "the public policy which includes inventions within the granted monopoly excludes from it all that is not embraced in the invention. It equally forbids the use of the patent to secure an exclusive right or limited monopoly not granted by the Patent Office and which it is contrary to public policy to grant." Beyond the limited monopoly which is granted, the arrangements by which the patent is utilized are subject to the general law. *Standard Sanitary Mfg. Co.* v. *United States, supra; Boston Store* v. *American Graphophone Co.,* 246 U. S. 8, 25; *Ethyl Gasoline Corp.* v. *United States, supra.*

We do not have here any question as to the validity of a license to manufacture and sell, since none of the "agents" exercised its option to acquire such a license from Masonite. Hence we need not reach the problems presented by *Bement* v. *National Harrow Co.,* 186 U. S. 70, and that part of the *General Electric* case which dealt with the license to Westinghouse Company. Rather, we are concerned here only with a license to vend. But it will not do to say that, since the patentee has the power to refuse a license, he has the lesser power to license on his own conditions. There are strict limitations on the power of the patentee to attach conditions to the use of the patented article. As Chief Justice Taney said in *Bloomer* v. *McQuewan,* 14 How. 539, 549, when the patented product

"passes to the hands of the purchaser, it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress." And see *Adams* v. *Burke,* 17 Wall. 453; *Hobbie* v. *Jennison,* 149 U. S. 355. In applying that rule, this Court has quite consistently refused to allow the form into which the parties chose to cast the transaction to govern. The test has been whether or not there has been such a disposition of the article that it may fairly be said that the patentee has received his reward for the use of the article. *Straus* v. *Victor Talking Machine Co.,* 243 U. S. 490; *Boston Store* v. *American Graphophone Co., supra.* And see *United States* v. *Univis Lens Co., ante,* p. 241. In determining whether or not a particular transaction comes within the rule of the *Bloomer* case, regard must be had for the dominant concern of the patent system. As stated by Mr. Justice Story in *Pennock* v. *Dialogue,* 2 Pet. 1, 19, the promotion of the progress of science and the useful arts is the "main object"; reward of inventors is secondary and merely a means to that end. Or, in the words of Mr. Justice Daniel in *Kendall* v. *Winsor,* 21 How. 322, 329, "Whilst the remuneration of genius and useful ingenuity is a duty incumbent upon the public, the rights and welfare of the community must be fairly dealt with and effectually guarded. Considerations of individual emolument can never be permitted to operate to the injury of these." And see *Blount Mfg. Co.* v. *Yale & Towne Mfg. Co.,* 166 F. 555.

That must be the point of departure for decision on the facts of cases such as the present one lest the limited patent privilege be enlarged by private agreements so as to by-pass the Sherman Act. *Ethyl Gasoline Corp.* v. *United States, supra,* pp. 456–459. Certainly if the *del credere* agency device were given broad approval, whole industries could be knit together so as to regulate prices and suppress competition. That would allow the patent

owner, under the guise of his patent monopoly, not merely to secure a reward for his invention but to secure protection from competition which the patent law, unaided by restrictive agreements, does not afford. Doubtless there is a proper area for utilization by a patentee of a *del credere* agent in the sale or disposition of the patented article. A patentee who employs such an agent to distribute his product certainly is not enlarging the scope of his patent privilege if it may fairly be said that that distribution is part of the patentee's own business and operates only to secure to him the reward for his invention which Congress has provided. But where he utilizes the sales organization of another business—a business with which he has no intimate relationship—quite different problems are posed since such a regimentation of a marketing system is peculiarly susceptible to the restraints of trade which the Sherman Act condemns. And when it is clear, as it is in this case, that the marketing systems utilized by means of the *del credere* agency agreements are those of competitors of the patentee, and that the purpose is to fix prices at which the competitors may market the product, the device is, without more, an enlargement of the limited patent privilege and a violation of the Sherman Act. In such a case the patentee exhausts his limited privilege when he disposes of the product to the *del credere* agent. He then has, so far as the Sherman Act is concerned, no greater rights to price maintenance [4] than the owner of an unpatented commodity would have. *Dr.*

---

[4] It should be noted in this connection that the Miller-Tydings Act (50 Stat. 693) which amended § 1 of the Sherman Act so as to legalize certain types of resale price agreements expressly excluded "any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other."

280

*Miles Medical Co.* v. *John D. Parks & Sons Co.*, 220 U. S. 373. Our reasons for that conclusion are as follows:

Congress has provided that a patentee shall have the "exclusive right to make, use, and vend the invention or discovery" for a limited period. 46 Stat. 376, 35 U. S. C. § 40. But the scope of the right to "vend" cannot be determined by reference to the private law of sales alone. Since patents are privileges restrictive of a free economy, the rights which Congress has attached to them must be strictly construed so as not to derogate from the general law beyond the necessary requirements of the patent statute. *United States* v. *Univis Lens Co., Inc., supra.* So far as the Sherman Act is concerned, the result must turn not on the skill with which counsel has manipulated the concepts of "sale" and "agency" but on the significance of the business practices in terms of restraint of trade.

In this case, some of the appellees had patents on hardboard, some did not. But each was tied to Masonite by an agreement which expressly recognized the validity of Masonite's patents during the life of the agreement and which required the distribution of the patented product at fixed prices. In the *General Electric* case, the Court thought that the purpose and effect of the marketing plan was to secure to the patentee only a reward for his invention. We cannot agree that that is true here. In this case, the price regulation was based on mutual agreement among distributors of competing products, some of whom had competing patents, as we have noted. None of these patents, except possibly some held by Celotex, had been held to conflict with or infringe the Masonite patents. Nor are we warranted in assuming, in absence of a definite adjudication, that one grant by the Patent Office is more valid than another. It is true that the District Court found that, both before and after the agreements in question, the various appellees had been active in attempting to find a substitute for the patented hard-

board which would not infringe Masonite's so-called "basic" patents; that they were not successful in that search; that the agreements did not discourage or dissuade them from their efforts to discover or develop non-infringing products; that they were willing and intended to terminate their respective agency agreements whenever it should become commercially possible to offer a competitive non-infringing product; and that many of the appellees have in fact distributed products which were in many respects competitive with hardboard. But those circumstances are not controlling.

The power of Masonite to fix the price of the product which it manufactures, and which the entire group sells and with respect to which all have been and are now actual or potential competitors, is a powerful inducement to abandon competition. The extent to which that inducement in a given case will have or has had the desired effect is difficult, if not impossible, of measurement. The forces which that influence puts to work are subtle and incalculable. Active and vigorous competition then tends to be impaired, not from any preference of the public for the patented product, but from the preference of the competitors for a mutual arrangement for price-fixing which promises more profit if the parties abandon rather than maintain competition. The presence of competing patents serves merely to accentuate that tendency and to underline the potency of the forces at work. Control over prices thus becomes an actual or potential brake on competition. This kind of marketing device thus, actually or potentially, throttles or suppresses competing and non-infringing products and tends to place a premium on the abandonment of competition. It is outside our competence to inquire whether the result was or was not beneficent, or whether the evil was or was not realized. As in case of an appraisal of the reasonableness of prices which

are fixed, such a determination could satisfactorily be made "only after a complete survey of our economic organization and a choice between rival philosophies" (*United States* v. *Trenton Potteries Co., supra,* 273 U. S. at p. 398) and only after weighing a host of intangibles. *United States* v. *Socony-Vacuum Oil Co., supra.* The power of this type of combination to inflict the kind of public injury which the Sherman Act condemns renders it illegal *per se.* If it were sanctioned in this situation, it would permit the patentee to add to his domain at public expense by obtaining command over a competitor. He would then not only secure a reward for his invention; he would enhance the value of his own trade position by eliminating or impairing competition. That would be no more permissible than a contract between a copyright owner and one who has no copyright, or a contract between two copyright owners or patentees, to restrain the competitive distribution of the copyrighted or patented articles in the open market. *Interstate Circuit, Inc.* v. *United States, supra,* p. 230. As stated in *Standard Sanitary Mfg. Co.* v. *United States, supra,* 226 U. S. at p. 49, rights conferred by patents "do not give any more than other rights an universal license against positive prohibitions. The Sherman law is a limitation of rights, rights which may be pushed to evil consequences and therefore restrained."

Since the transactions here challenged were in interstate commerce, no question as to the violation of the Sherman Act remains.

But it is urged that the agreements made by the appellees in 1941, after the present suit was instituted, mark an abandonment of the former combination; and that, since the new arrangement is unobjectionable, there is nothing to enjoin. The difficulty with that contention is that the 1941 agreements, though improved models of an agency arrangement, removed none of the features which we have found to be fatal. They still are unmistakable

price-fixing agreements with competitors. And if there were any lingering doubt as to whether the appellees were parties to a conspiracy, it is dispelled at this point. A committee of the appellees was appointed to draft the new agreement. The agreement was completed after meetings at which representatives of all of the appellees attended. The 1941 agreements were the product of joint and concerted action.

*Reversed.*

Mr. Justice Roberts and Mr. Justice Jackson did not participate in the consideration or decision of this case.