## UNITED STATES v. LINE MATERIAL CO. et al.

Civ. A. No. 1696.

District Court, E. D. Wisconsin.

March 6, 1946.

Timothy Cronin, U. S. Atty., of Milwaukee, Wis., and Melville C. Williams, Dept. of Justice of Chicago, Ill., for plaintiff.

Louis Quarles, Maxwell Herriott, and Clark Hazelwood, all of Milwaukee, Wis., and Charles Meroni, of Chicago, Ill., for Line Material Co.

Thomas H. Spence, of Milwaukee, Wis., and Alexander C. Neave, Harry R. Pugh, Jr., and William J. O'Hearn, Jr., all of New York City, for General Electric Co.

George Affeldt, of Milwaukee, Wis. (Foster & Vogel and E. M. Harrington, all of St. Louis, Mo., of counsel), for James R. Kearney Corporation.

J. H. Marshutz, of Milwaukee, Wis., and James A. Murray and Wilder Lucas, both of St. Louis, Mo. (Fish, Marshutz & Hoffman, of Milwaukee, Wis., and Sullivan, Finley & Lucas, of St. Louis, Mo., of counsel), for W. N. Matthews Corporation.

Willis G. Sullivan, of Milwaukee, Wis., for Pacific Electric Mfg. Co.

Wilber Owen, of Toledo, Ohio, and Willis G. Sullivan, of Milwaukee, Wis. (Owen & Owen, of Toledo, Ohio, of counsel), for Porcelain Products Co.

Louis A. Lecher, of Milwaukee, Wis. (Robert W. Smith, of Greensburg, Pa., of counsel), for Railway Industrial Engineering Co.

Willis G. Sullivan, of Milwaukee, Wis., for Royal Electric Mfg. Co.

Louis A. Lecher, of Milwaukee, Wis. (John A. Dienner and Edward C. Grelle, both of Chicago, Ill., of counsel), for Sweitzer & Conrad, Inc.

W. F. Sonnekalb, Jr., of New York City, Louis Quarles and Maxwell Herriott, both of Milwaukee, Wis., and Needham A. Graham, Jr., of Birmingham, Ala., for Southern States Equipment Corporation.

Louis A. Lecher, of Milwaukee, Wis. (Cravath, Swaine & Moore, Albert R. Connelly, George B. Turner, and John J. O'-Connell, all of New York City, of counsel),

for Westinghouse Electric & Manufacturing Co.

Willis G. Sullivan, of Milwaukee, Wis., for T. F. Johnson.

DUFFY, District Judge.

As a boy in grade school I many times pondered the answer to the problem then often discussed among younsters: What would happen if an irresistible force came into collision with an unbreakable and immovable object? The issue to be decided in the case at bar recalls that boyhood problem when I consider how the ambit of the monopoly given to the owner of a patent and to his licensees by the patent laws comes into head-on collision with the ambit of the Sherman Anti-Trust Law, 15 U.S. C.A. §§ 1–7, 15 note.

■ The eighth clause of Article I, Section 8, of the United States Constitution gives Congress the right to grant patents. The third clause of the same article and section gives Congress the right to regulate interstate commerce, and the Sherman Act is an exercise of that power. It is apparent, therefore, that the patent laws and the Sherman Act must be given an equal standing, and no presumption may be indulged in that the one placed a limitation upon or dominates the other.

The complaint herein alleges an unlawful combination and conspiracy among the defendants to control prices of certain types of dropout fuse cutouts in violation of Section 1 of the Sherman Act. Cutouts are protective devices used to break an electric circuit when the current becomes excessive because of a short circuit or other overload. Where higher voltages are utilized, such as on distribution and power lines, two types of cutouts are commonly used, known as dropout and non-dropout fuse cutouts, which may be either open, or enclosed in an insulated housing such as a porcelain box. Both comprise two insulated terminals connected by a meltable and replaceable wire or fuse link enclosed in an insulating tube called an expulsion tube. When the fuse link melts in a non-dropout fuse cutout the tube stays in position and must be removed by hand. In the dropout type, when the fuse link ruptures, the tube automatically drops or swings out of place. In the dropout fuse cutouts involved in this suit, a double jointed hinge at the bottom permits the tube to drop upon the rupture of the fuse link.

Plaintiff charges that in early 1938 the defendants Line Material Company (hereinafter called "Line") and Southern States Equipment Corporation (hereinafter called "Southern") agreed to pool certain of their patents in a scheme to fix the selling prices of themselves and other manufacturers of dropout fuse cutouts. Plaintiff claims it was an attempt by the principal manufacturers of cutouts to utilize patents to fix prices upon an industry-wide basis; and that the prices so fixed affected sales of twelve manufacturers who manufactured substantially all of the dropout fuse cutouts distributed in the United States.

There are two principal patents involved in this suit: the Lemmon Patent No. 2,150,-102 issued March 7, 1939, and the Schultz and Steinmayer Patent No. 2,176,227 issued October 17, 1939, reissued Re-22,412 on December 21, 1943. The Lemmon patent is owned by Southern. It covers a dropout fuse cutout mounted on a double hinge at the bottom. The latching mechanism is released by a solenoid which is relatively complicated and expensive. The Schultz and Steinmayer patent (hereinafter called "Schultz patent") is owned by Line. It covers a cutout with a double jointed hinge but with a fuse link instead of the intricate solenoid mechanism. The hinge is kept rigid by one end of the fuse link, but when the fuse link is ruptured the tube drops, which automatically releases the upper latch and permits the tube to swing down. This is a simple and less expensive device than shown in Lemmon, but the Lemmon patent reads on the Schultz patent.

A third patent, which will be hereafter referred to, is the Kyle Patent No. 1,781,-876 issued November 18, 1930, reissued Re-18,020 on March 31, 1931, and again reissued Re-19,449 on February 5, 1935. Four of its claims covered any fuse cutout, whether dropout or non-dropout, in combination with a box made of wet process porcelain.

All of the defendants are manufacturers of electrical devices of various kinds. The dropout fuse cutouts manufactured by the defendants subject to the price limitations contained in the patent licenses constitute 40.77% of the average aggregate annual sales by these defendants of all cutouts. Two of the defendants will be hereafter referred to as General Electric and as Schweitzer and Conrad; T. F. Johnson will be referred to as Johnson; and the other defendants by the first word of their

corporate name. All defendants ship their products in interstate commerce with the possible exception of Royal and Johnson.

During the years 1940 to 1944, inclusive, the sales of dropout fuse cutouts covered by one or more of the three patents hereinabove described totaled $1,918,000 and were distributed among the defendants as follows: General Electric, 29.2%; Line, 25.4%; Kearney, 18.9%; Southern, 7.9%; Westinghouse, 5.3%; Schweitzer and Conrad, 5.1%; Railway, 3.8%; Matthews, 2%; Porcelain, 1.5%; Royal, 0.5%; Pacific, 0.2%; and Johnson, 0.2%.

In the manufacture of open dropout fuse cutouts involved in this suit, the Lemmon patent owned by Southern and the Schultz improvement patent owned by Line were utilized. In making enclosed dropout fuse cutouts the inventions covered by the Lemmon and Schultz patents were utilized in combination with Kyle patent Re-19,449 if a wet process porcelain box were used.

Southern had popularized the idea of a dropout fuse cutout and had sent out notices of infringement. It offered licenses under its broad dropout patent, U. S. 1,821,-761. From the beginning Southern insisted that any licensee must agree not to sell patented devices made under the license at a price lower than that at which Southern offered and sold same. Although only a nominal royalty of 1% was requested, no such licenses were accepted. Line had numerous patents in the cutout field and it also had insisted on price protection on any license given under its important patents.

Southern had pending in the Patent Office the Lemmon application on a double hinge dropout. In 1934 the Lemmon and Schultz applications were declared in interference, No. 68,183. Final Patent Office action was reached in November, 1937, pursuant to which Lemmon was awarded the dominant claims for the double hinge circuit breaker operated by a solenoid and Line was awarded the subservient claims for a double jointed hinge dropout cutout with a tube supported by a fuseable element. Line was infringing Southern's patents in the manufacture of practically all of its dropout fuse cutouts. Nevertheless the subservient claims allowed to Line were a great improvement over Lemmon's solenoid mechanism and much simpler and less expensive to manufacture. If Southern desired to utilize this less expensive device, it would have to obtain a license from Line.

Accordingly Southern welcomed a suggestion from Line that their conflicts and contests be compromised. This resulted in an agreement dated May 23, 1938, wherein Line and Southern settled the interference and under which agreement Southern licensed Line under the Lemmon application, and Line licensed Southern under the Schultz application, and authorized Southern to grant sublicenses thereunder. The cross-license agreement between Line and Southern was on a royalty-free basis. The agreement also provided that all sublicenses granted by Southern under Line's patents were required to include provisions for minimum prices to be established by Line, and all sublicenses under the Lemmon patent were to include provisions for minimum prices to be fixed by Southern.

Line gave Southern a license under the whole of Line's patent covering the commercially accepted dropout fuse cutout. Southern, however, kept for itself some features covered by Southern's patents and licensed Line to use the invention only in equipment "in which the circuit interruption is caused by melting of a fuseable element."

The price limitation in the license to Line provided that the prices, terms, and conditions of sale of Line for equipment made and sold under the licenses granted "shall so long as electric fuse equipment continues to be covered by letters patent of the Southern Corporation under which a license is granted by this agreement, be not more favorable to the customers than those established from time to time and followed by the Southern Corporation in making its sales."

In the foregoing agreement, while Southern had received a royalty-free license under Line's enclosed patents, it had no right to grant licenses to others to make and sell the inventions of Line's enclosed dropout patents. Pursuant to the authority vested in him by the cross-license agreement, Mr. Lemmon sought to interest infringing manufacturers of dropout fuse cutouts in taking a license under the double hinge inventions. General Electric insisted that Lemmon give them a clearance with respect to enclosed dropouts, but Lemmon could not do so. Infringers objected to dealing with Lemmon as licensor on open dropouts and with Line as to enclosed dropouts.

On October 3, 1938, Kearney executed a license with Southern but Line refused to execute a confirmation requested by Kearney because Line contended it would

operate as an implied license under Line's enclosed dropout patents. Shortly after October 3, 1938, Southern submitted to a number of manufacturers a form of proposed license agreement which corresponded with the agreement signed by Kearney, and which provided for price control by Southern of dropout fuse cutouts covered by its patents and for price control by Line of dropout fuse cutouts covered by Line's patents. However, the provisions of the Kearney license were never enforced, being first postponed until the issuance of the Lemmon patent on March 7, 1939, and ultimately being superseded by the cross-license agreement between Line and Southern dated January 12, 1940. The form of the so-called "standard" license signed by .Kearney was discussed at a meeting held in Chicago in late October, 1938. Those present were Kearney, General Electric, Westinghouse, Matthews, Schweitzer and Conrad, and Pacific.

Several of the infringing ' defendants spent much time and effort in attempts to find both in this country and in Europe prior art which would show that no valid patents could issue to others covering their devices. They were unsuccessful in this quest. When they reluctantly concluded there was no hope of invalidating the patents, several defendants, particularly General Electric, attempted to design around them and thus avoid infringement. These efforts were likewise unsuccessful.

At a meeting held in New York on June 1, 1939, defendants General Electric, Westinghouse, Matthews, Schweitzer and Conrad, and Railway concluded that it would be more feasible if Line would be the licensor rather than Southern. Being the owner of the enclosed dropout patents, Line was willing to act as·such licensor because it could give the desired clearance as to such patents as well as the licenses under its open dropout patents. After numerous discussions and correspondence between Line and Southern, and meetings and correspondence between various defendants, and also between Line and Southern and other defendants, a new cross-license agreement was executed on January 12, 1940. The positions of Line and Southern were transposed from that in the earlier agreement. Line was granted a license under Southern's double hinge patents but only for cutouts in which the "circuit interruption is caused by the thermally initiated ·rupturing of a current carrying element in an expulsion tube." Line also was authorized to grant licenses to third persons to make and sell electrical equipment embodying the invention of Southern, limited as aforesaid.

Paragraph 15 of the new agreement provided that Southern received a license under the Line patents specified therein on condition that "* * * the prices, terms and conditions of sale of the Southern Corporation for electric fuse equipment, made and sold under the licenses herein granted, shall, so long as such electric fuse equipment continutes to be covered by Letters Patent of the Line Company under which a license is granted by this agreement, be not more favorable to the customer than those established from time to time and followed by the Line Company in making its sales."

In June, 1940, Matthews, Railway and Kearney deposited signed license agreements in escrow. The agreement was not to be effective until three out of five named cutout manufacturers in addition to Line, Southern and General Electric had entered into substantially identical license agreements. The condition of the escrow was satisfied and the license agreements became effective on July 5, 1940. It was at this time that the license agreement of October 3, 1938, between Southern and Kearney was cancelled. Porcelain and Pacific signed license agreements on November 15, 1940, Schweitzer and Conrad on January 20, 1941, Westinghouse on January 29, 1941, Johnson on June 15, 1943, and Royal on March 24, 1944.

Line, Southern, Kearney, and General Electric each made no attempt to carry out their written agreement until after similar written agreements of Matthews, Railway and the new agreement with Kearney became effective in July, 1940. A schedule of prices for use by all licensees was prepared in the fall of 1940, by the joint efforts of all defendants except Porcelain, Pacific, Johnson and Royal. Defendants Line, Kearney, Matthews, Pacific, Porcelain, Railway and Southern adhered to such prices starting January 18, 1941; General Electric starting February 3, 1941; and Schweitzer and Conrad, Westinghouse, Johnson, and Royal starting when each signed their license agreement respectively. The schedule was modified in certain respects, but as revised has remained in effect up to the present time.

Considering first whether the cross-licensing agreements between Line and

Southern were illegal, I do not understand that the government complains of the exchange by Line and Southern of manufacturing rights under their respective double hinge patents. Under the circumstances then existing it was a logical business practice for these two concerns to thus exchange manufacturing rights. But the government charges a conspiracy in restraint of trade between Line and Southern to which the defendant licensees became parties at various times thereafter. The conspiracy is stated to be the use of the combined patents of Southern and Line (1) as a screen for the price fixing scheme by entering into a series of license agreements, (2) to influence manufacturers by threatening infringement suits, (3) to police prices fixed pursuant to said scheme.

Line and Southern had complementary patents. Owners of competing patents do not need cross-licensing, but manufacturers of complementary patents must have cross-licenses if the public is to have the benefit of the cheaper device covered by the subservient patent.

It is well established that under the Sherman Act an agreement fixing the price of a competitive product moving in interstate commerce is illegal per se, for such an agreement is conclusively presumed to restrain trade. In United States v. Univis Lens Co., Inc., 316 U.S. 241 at page 252, 62 S.Ct. 1088, at page 1094, 86 L.Ed. 1408, Chief Justice Stone said: "* * * Agreements for price maintenance of articles moving in interstate commerce are, without more, unreasonable restraints within the meaning of the Sherman Act because they eliminate competition * * *." It is also a well established rule that for his own protection a licensor may fix the minimum selling price to which his licensee may make and sell devices embodying the licensor's patented invention. In the absence of such a license, the patented product could not lawfully move in interstate commerce. In Ethyl Gasoline Corp. v. United States, 309 U.S. 436, at page 456, 60 S.Ct. 618, at page 625, 84 L.Ed. 852, after condemning control of resale prices, Mr. Justice Stone stated: "* * * He (patent owner) may grant licenses to make, use or vend, restricted in point of space or time, or with any other restriction upon the exercise of the granted privilege, save only that by attaching a condition to his license he may not enlarge his monopoly and thus acquire some other which the statute and the patent together did not give."

The comment of the Circuit Court of Appeals for this circuit in two cases gives enlightenment. In American Equipment Co. v. Tuthill Building Material Co., 7 Cir., 69 F.2d 406, the court ruled (page 408): "* * * The size of output or percentage of total output produced by licensees has no bearing on patentee's right to license. In short, the patentee may exclude all from making, selling, or using his patent in the United States, and this carries with it the right to exclude some and license others. As far as the contract in question deals with the exercise of the patentee's recognized legal monopoly, it is not subject to the prohibitive provisions of the antitrust laws." In Rubber Tire Wheel Co. v. Milwaukee Rubber Works Co., 7 Cir., 154 F. 358, the court said (page 362): "* * * The true test of violation of the Sherman law is whether the people are injured, whether they are deprived of something to which they have a right. Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679. * * *" And (154 F. page 363): "None of the provisions of the contract, in our judgment, touched any matter outside of the monopoly under the patent. The control of prices and output, for reasons already stated, did not deprive the public of any right. * * * but the public was not entitled to profit by competition among infringers. * * *"

However, the case which is controlling is United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. A cross-license agreement existed between General Electric and Westinghouse which contained agreements even more restrictive than the price protection provisions of the cross-licenses involved in the case at bar. Chief Justice Taft, speaking for the court, said (272 U.S. page 490, 47 S.Ct. 197): "* * * When the patentee licenses another to make and vend, and retains the right to continue to make and vend on his own account, the price at which his licensee will sell will necessarily affect the price at which he can sell his own patented goods. It would seem entirely reasonable that he should say to the licensee, 'Yes, you may make and sell articles under my patent but not so as to destroy the profit that I wish to obtain by making them and selling them myself.' * * *" The validity of the license granted by the General Electric Com-

pany to the Westinghouse Company was sustained.

The government contends herein that the decision in United States v. General Electric Co., supra, is "plainly wrong in principle" and that such decision should be strictly limited to the facts in that case. The government argues further that the General Electric decision erroneously assumed that price fixing is necessary to protect the patent owner in the enjoyment of rights afforded him by his patent.

■ It is not for this court to overrule the principle laid down by the Supreme Court in the General Electric case. That court was asked to overrule the General Electric decision when it was considering United States v. Univis Lens Co., supra, and United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461, but chose not to do so. If there is to be any change in the rule laid down in the General Electric case, the Supreme Court will have to make that change.

■ The government strongly relies on United States v. Masonite Corp., supra. Masonite owned a patent on a new product and eliminated competition by entering into certain "agency" and "del credere factor" agreements with its competitors who agreed to sell only at prices fixed by Masonite. The court considered that when Masonite assured itself of the dominant manufacturing position in the industry and obtained the use of the sales departments of its competitors, with a guarantee of payment for the goods sold, it had eliminated competition by fixing in effect the resale prices. The court said (316 U.S. page 278, 62 S.Ct. 1077, 86 L.Ed. 1461): "* * * The test has been whether or not there has been such a disposition of the article that it may fairly be said that the patentee has received his reward for the use of the article. * * *" And (316 U.S. page 279, 62 S.Ct. 1078, 86 L.Ed. 1461): "* * * And when it is clear, as it is in this case, that the marketing systems utilized by means of the del credere agency agreements are those of competitors of the patentee and that the purpose is to fix prices at which the competitors may market the product, the device is without more an enlargement of the limited patent privilege and a violation of the Sherman Act. In such a case the patentee exhausts his limited privilege when he disposes of the product to the del credere agent. * * *" Of course agreements

which fix resale prices for goods in interstate commerce are per se an illegal restraint of trade because after the transfer, the patented product is free from the patent monopoly, but this is not true as to the first sale of products made and sold under a patent license. Here the patentee had not exhausted his limited privilege.

Plaintiff argues in effect that as a condition of obtaining a license, Line required that the licensee use Line's patented wet process porcelain box. This is not correct. Westinghouse had developed a satisfactory substitute and enclosed its double hinge dropouts in "Prestite" housing. Also the evidence discloses that Line offered, at the option of the licensee, licenses under the double hinge dropout patents alone, or under the double hinge dropout patents and Line's enclosed dropout patents including Kyle Re-19,449.

I have considered the government's contentions that prices were fixed in the license agreements on unpatented articles, but find no basis for such contention.

■ If the cross-license and the license agreements herein are held to be in contravention of the anti-trust acts, then a curious result would follow. Instead of removing a restraint on interstate commerce, such holding would result in the elimination of all trade in the devices herein considered because the patents involved are complementary. Line could not produce without a license from Southern, and Southern would need a license from Line to produce and sell the commercially accepted device. It could be argued that the patentee could grant a license without any price protection. That of course is true, but so might it grant a license without any royalty. However, under United States v. General Electric Co., supra, both are "normally and reasonably adapted to secure pecuniary reward for the patentee's monoply." I conclude that the cross-license and the licenses pursuant thereto were not in themselves in restraint of trade and were not unlawful under the Sherman Act. The remaining question is: Was there any agreement or conspiracy in restraint of trade among the defendants extrinsic of the patent licenses?

■ It would unduly prolong this opinion to comment in detail on the government's contention that the various meetings participated in by Line and Southern as well as certain of their co-defendants prove that the license agreements were executed

merely as a screen for their plan or conspiracy to fix prices. I am of the opinion that the evidence herein discloses no such purpose.

In as much as no illegal conspiracy existed between Line and Southern, the case against the other defendants falls. However, should it be determined on appeal that the principle expressed in United States v. General Electric Co., supra, no longer obtains, or if it be determined that an illegal conspiracy existed between Line and Southern dehors their cross-license agreement, then it may be helpful to express briefly my conclusions as to the roles played by the other defendants.

### General Electric

General Electric at all times strongly opposed the idea of price control. It conducted an extensive search to find applicable prior art to invalidate the patents. It endeavored to invent around the patents. Its conferences with other defendants were with the idea of avoiding a license rather than joining in a conspiracy to fix prices. However, it became apparent that General Electric would have to secure a license under both the Schultz and Lemmon patents or cease making its dropout fuse cutouts. It then conducted its own negotiations and was the first to take a license from Line. It did so independently from the other infringers. After taking such license it placed particular emphasis on the sale of a non-dropout fuse cutout which was not price controlled.

### Matthews

Both before and after the issuance of the Lemmon and Schultz patents, Matthews was strongly opposed to price control. When the Lemmon patent issued, Matthews contacted General Electric, Westinghouse, Railway, and Schweitzer and Conrad with a view of having them delay signing a license agreement until it could be determined whether prior art could be found which would avoid the necessity of taking a license. At the meeting of June 1, 1939, the infringers exchanged information as to evidence of anticipation. Contrary to the contention of the government, Matthews did not delegate authority to General Electric to bind Matthews. It is true there was cooperation between proposed licensees to try to avoid taking a license. When that was unsuccessful there was cooperation to try to obtain the best possible terms. However, there never was an understanding or agreement between various licensees that they would take licenses. Even after General Electric took its license, Matthews hesitated and insisted upon different terms from those included in the General Electric agreement. Meantime and up to late December, 1939, Matthews continued to search for proof of anticipation. This was not consistent with a desire for a license calling for price control.

The government insists that the escrow agreement indicates illegal cooperation. On the contrary, resorting to the use of the escrow agreement proves that there was no agreement between the three who entered into it and the other defendants which subsequently did so, for when Matthews deposited its agreement in escrow, it had no knowledge that other manufacturers would also agree to it. Certainly at that time Matthews had no agreement with any of the other prospective licensees.

### Westinghouse

Westinghouse manufactures a number of devices, some of which fall within the claims of the Line-Southern patents but many of which do not. It began the manufacture of a dropout fuse cutout in 1937.

Because no evidence showed that Westinghouse knew of the conferences between Line and Southern in 1938 at which time plaintiff claims the illegal conspiracy originated, plaintiff claims that Westinghouse subsequently acquired knowledge of the illegal purpose to fix prices and joined in such conspiracy.

The Westinghouse license was dated January 29, 1941, and under it Westinghouse was forced to concede price control to Line on cutouts covered by two of Line's patents. Plaintiff insists, however, that prior to the meeting of June 1, 1939, Westinghouse was acquainted with the illegal purpose of the alleged scheme to fix prices. The meeting of June 1 has been heretofore discussed. For nine months thereafter Westinghouse continued to search for material that might invalidate the Lemmon and Schultz patents. It pressed the development of its boric acid dropout fuse which was not covered by the patents. Its efforts to invent around the Kyle patent resulted in the development of "Prestite" for enclosed cutouts, and this product was placed on the market late in 1940.

### Schweitzer and Conrad

At the time of the trial Schweitzer and Conrad were supplying about 3% of the equipment being sold by all of the licensees

978

under the licenses, and, in competition with such licensed cutouts, was also selling a number of cutouts not under license and not under price control. Schweitzer and ·Conrad had made serious effort to find prior art to invalidate the patents, and in negotiations sought to limit the scope of the license and price control. Like other defendants it was ultimately forced over its objections to accept the license containing the price control provisions.

### Kearney

Kearney was the only one of the defendants which took a license under Southern, and might therefore be considered to have more knowledge, if any, of the agreement between Line and Southern than any other defendant. However, Kearney was in an unusual situation. It began manufacturing and selling dropout cutouts in 1932. It filed a patent application in 1933. Its patent application was declared in interference, and some applications were pending on October 3, 1938, when Kearney took a license from Southern. In 1938 business relations between Kearney and Line Material were somewhat strained due to certain infringement suits, and the officers of Kearney were apprehensive that Line Material might not grant it a license. While Kearney never registered opposition to price control, this was largely due to its desire to obtain a license which would permit it to remain in the cutout business, which was a substantial part of its line. Kearney did not attend the June 1, 1939, meeting and except for its license agreement did not have any other understanding or agreement with Line or Southern.

### Pacific, Johnson, Royal, Porcelain and Railway

■ The details as to the other defendants will not be discussed. They were relatively small operators. They were forced to take out licenses, and they did so reluctantly. There was no evidence to show they had any knowledge of any illegal purpose to fix prices. Even if a conspiracy existed between Line and Southern, the mere acceptance of a legal license, without more, from a member of an illegal conspiracy in itself does not make the licensee a party to the conspiracy. Gasoline Products Co., Inc. v. Champlin Refining Co., D.C., 46 F. 2d 511, 514.

Therefore, it is my conclusion that all of the defendants are entitled to a judgment of dismissal.