**C.B.S. BUSINESS EQUIPMENT CORP. and Modern Business Machines Corp., Plaintiffs,**

v.

**UNDERWOOD CORPORATION, Ing. C. Olivetti & C., S.p.A., Olivetti Corporation of America and Olivetti Sales Corporation, Defendants.**

United States District Court
S. D. New York.
Dec. 30, 1964.

**414**

Alexander Hamilton, New York City, for plaintiffs.

Webster, Sheffield, Fleischman, Hitchcock & Chrystie, New York City, Ethan Hitchcock, New York City, of counsel, for defendants.

TENNEY, District Judge.

Plaintiff, C. B. S. Business Equipment Corp. (hereinafter referred to as "CBS" or as "plaintiff") moves herein for partial summary judgment against one of the defendants, Underwood Corporation (hereinafter referred to as "Underwood") under Rules 56(a) and (c) of the Federal Rules of Civil Procedure on the ground that there is no genuine issue as to any material fact with respect to the alleged illegality of the Sales Agency Agreement of January 20, 1961 (hereinafter at times referred to as the "Sales Agreement" or "Agreement") entered into by Underwood with CBS and others.

Plaintiff contends that said Sales Agreements are presumed to be unreasonable and illegal *per se* under Section 1 of the Sherman Act (26 Stat. 209 (1890), as amended, 50 Stat. 693 (1937), 15 U.S.C. § 1 (1963)) and Section 3 of the Clayton Act (38 Stat. 731 (1914), 15 U.S.C. § 14 (1963)), in that they contain illegal price-fixing, territorial and other restrictive agreements and constitute illegal agreements between Underwood and its retail competitors. CBS contends that the only genuine issue relates to the amount of damages.

By cross-motion, defendant Underwood moves for summary judgment for a determination that the said Sales Agreement creates a genuine agency and is in all respects lawful under the anti-trust laws, and seeks a dismissal of that part of the complaint herein as is based on the alleged illegality of the Sales Agreement.

CBS is a New Jersey Corporation, located in Hackensack, New Jersey, which, since 1949, has engaged in the sale of office machines, equipment, furniture and supplies, and in the service, repair and maintenance of such products. CBS was formed by three former Remington salesmen who continue to be CBS's principals today. After forming CBS, they obtained contracts with Underwood as individual salesmen entitled individually to commissions from their sales of specified Underwood products.

Underwood (now known as Olivetti Underwood Corporation) is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in New York, New York, and is a manufacturer of typewriters and office machines in the United States.

Ing. C. Olivetti & C., S.p.A. (hereinafter referred to as "Olivetti") is a corporation incorporated under the laws of the Republic of Italy, engaged in the manufacture and distribution, among other things, of business machines, particularly typewriters, adding and calculating machines.

In 1950, Olivetti Corporation of America, a wholly-owned Delaware corporation (hereinafter referred to as "Olivetti America"), was formed by Olivetti to commence the importation of Olivetti products for sale and distribution in the United States. Originally, Olivetti America appointed business-equipment dealers to serve as exclusive regional distributors to purchase machines from it and, in turn, sell the machines both at retail and to dealers in their region who, in turn, sold at retail.

One of those with whom these exclusive regional distributors entered into dealer agreements was CBS, which on August 28, 1950, entered into an "Exclusive Dealership Agreement" with Atlas Business Machines Corporation, a wholesale distributor of Olivetti products, for the "Olivetti 14 Printing Calculator." This exclusive dealership was for Passaic County and for Bergen County with the exception of Fairview, Cliffside Park, Edgewater and Fort Lee. Thus CBS, in the period from 1950 to 1955, was selling Olivetti products as a franchised dealer, and was selling Underwood products in a specified territory through individual salesman-contracts between Underwood and the CBS principals.

In 1953, in order for Olivetti America to undertake retail selling, Olivetti America formed Olivetti Sales Corporation, a wholly-owned Delaware corporation (hereinafter referred to as "Olivetti Sales").

In the succeeding years, Olivetti Sales established retail branches, took over from the exclusive regional distributors in the areas surrounding those branches, and by 1957 had superseded Olivetti America's exclusive regional distributor, Atlas Business Machines Corporation, in the New York-New Jersey area.

In 1955, Underwood advised the CBS principals that they must elect between carrying Underwood and Olivetti products, and CBS elected to continue with the Olivetti products.

On March 1, 1957, Olivetti America's distributor, Olivetti Sales (which had superseded Atlas Business Machines Corporation) and CBS entered into an exclusive dealer-contract for Bergen and Passaic Counties in northern New Jersey. The contract, which excluded "portables", called for a specified quota of sales with right of termination if CBS failed to meet the quota, and with right of termination on either party's giving the other 30 days' notice. This 1957 dealer-contract was superseded by another dealer-contract between CBS and Olivetti Sales, dated July 12, 1958, having the same basic terms but increasing the quotas which CBS would thereafter be expected to sell.

On July 1, 1959, CBS entered into a Sales Agency Agreement with Underwood which was in some respects the same form of Agency Agreement as the January 20, 1961 Sales Agency Agreement involved herein. The products covered were Underwood Standard and Electric Typewriters and Underwood Sunstrand Adding Machines. CBS was given an exclusive territory consisting of eleven (11) specified towns, all within the confines of Bergen County, New Jersey. Machines were to be furnished to CBS on consignment. CBS agreed to solicit orders, remit them to Underwood for acceptance, "adhere strictly to the selling prices * * *" fixed by Underwood, and "not to sell any new merchandise * * *" in competition with the Underwood line.

Under the dealer-contract with Olivetti Sales, dated July 12, 1958, CBS was given the exclusive right to sell and was assigned a quota for Olivetti Standard and Electric Typewriters, electric adders, and calculators. However, by agreement dated October 1, 1959, Olivetti Sales' exclusive and quotaed products were limited to calculators. Thus CBS, in October of 1959, was placed in a position where it was able to comply with the 1959 Underwood Agency Contract to sell exclusively Underwood typewriters and adding machines, and also comply with its quota requirements under the Olivetti Sales Contract now limited to calculators.

By agreements dated September 29, 1959, and July 1, 1960, Olivetti acquired approximately 67 percent of the common stock of and control of Underwood. Pursuant to the agreement of July 1, 1960, Underwood assumed the obligations and liabilities of Olivetti America. In October 1959, Underwood had approximately one hundred of its own branch outlets and approximately five hundred sales agents operating under the type of agency contract which CBS had entered into with Underwood on July 1, 1959. Olivetti Sales, at that time, had approximately eleven branches and four hundred franchised dealers, each of whom had been assigned an exclusive Olivetti territory. Since the Underwood branch and agent organization, as well as the Olivetti Sales dealer-contracts, contemplated exclusivity of territory, it was obvious that there would be conflicts in the territorial assignments of the Olivetti dealers and the Underwood branches and agents.

Accordingly, from October of 1959 until January of 1961, reorganization of the Underwood and Olivetti distribution systems was undertaken. Both the Underwood agency-contracts and Olivetti Sales dealer-contracts, to the extent permitted by their terms, were cancelled during 1960 in order to terminate product and territorial exclusivity rights under those contracts and to allow both Olivetti Sales dealers and Underwood agents to sell both Underwood and Olivetti products pending the reorganization.

In September of 1960, CBS and Underwood (which had acquired the assets of Olivetti America, including the stock of Olivetti Sales and the right to distribute Olivetti products in the United States) negotiated the termination of CBS's dealer franchise agreement with Olivetti Sales and the award of a further Underwood Sales Agency contract to CBS. The form of the "Sales Agreement" was under revision at the time of the September 1960 negotiation, and, accordingly, a letter-agreement was entered into between CBS and Underwood on September 19, 1960, stating that the terms of the agreement would be in accordance with the "standard Underwood Agency Contract, to be released in the near future."

With the foregoing summary of the facts leading up to the execution by CBS of the Underwood Sales Agency Agreement of January 20, 1961, I will now proceed to an analysis of the agreement itself.

Defendants argue that the relationship created by the agreement was one of principal and agent.

Plaintiff CBS contends that this characterization is incorrect—that actually the agreement is invalid *per se* as a resale price-fixing and maintenance agreement and an illegal territorial and otherwise restrictive agreement between competitors in violation of Section 1 of the Sherman Act, and an unlawful "tying" arrangement in violation of Section 3 of the Clayton Act.

Article 1 of the Sales Agreement provides that:

"[Underwood] * * * hereby constitutes and appoints the Sales Agent, its Sales Agent for the sale of the new machine product listed on Schedule 'B' * * * for a term of one year from the date hereof and thereafter until and unless cancelled * * *. *The Sales Agent hereby accepts such appointment and agrees to devote his best endeavor to the*

business of [Underwood] \* \* \*." (Emphasis added.)

Article 2 of the Sales Agreement provides that Underwood shall:

"(a) *Pay* the Sales Agent monthly *commissions on sales* of product effected by him *within the territory specified* \* \* \*." (Emphasis added.)

"(b) *Render all invoices* covering the purchase of product *direct to the purchaser* and have full control of and discretion as to billing, collection, adjustment and compromise of all accounts covering product." (Emphasis added.)

"(c) *Deliver* to the Sales Agent, freight prepaid, sample product *for demonstration* purposes, *and* delivery *against orders only*, at such times and in such quantities as it shall deem best, *and title and right of possession thereto shall* remain in [Underwood] \* \* \* until such product is sold and paid for." (Emphasis added.)

Article 3 of the Sales Agreement requires the Sales Agent to:

"(a) \* \* \* [M]aintain for the sale and repair of said product, at his own expense, an adequate place of business \* \* \*."

"(b) Employ in his own name, at his own expense, and on his own responsibility such number of selling representatives as may be necessary to secure from said territory at least the quota of sales \* \* \* assigned \* \* \*."

"(c) Make himself and his selling representatives available for such *sales training* as \* \* \* [Underwood] deems necessary \* \* \*." (Emphasis added.)

"(d) Furnish satisfactory mechanical services \* \* \* and \* \* \* employ in his own name, at his own expense and on his own responsibility such competent servicemen as may be necessary. \* \* \* [T]o carry out without expense to either [Underwood] \* \* \* or to the owner [Underwood's] \* \* \* warranty on all said product located within said territory."

"(e) Cover said selling representatives and other employees by Workmen's Compensation and Employer's Liability Insurance \* \* \* and to be \* \* \* responsible for \* \* \* all acts \* \* \* of negligence \* \* \*."

"(f) Not use the names 'Underwood' or 'Olivetti' and all or any part of the trade name of the product as his firm, trade or corporate name without the express written consent of [Underwood] \* \* \*. The Sales Agent may use the statement 'Authorized Agent of Underwood Corporation for Sales and Service of [*Name of Product*].' "

"(g) Advertise the product under the trade name \* \* \* and use all such *sales forms*, records, advertising and printed matter as may be *furnished by [Underwood]* \* \* \*." (Emphasis added.)

"(i) Immediately *transmit to [Underwood]* \* \* \* all original orders received from purchasers for product." (Emphasis added.)

"(j) Keep, in a manner satisfactory to [Underwood], \* \* \* accurate and complete *records* showing the number \* \* \* of product received by him, \* \* \* when and with whom placed for any purpose, the date of each call made on each prospective purchaser having product for demonstration, when and to whom sold, and the prices and terms at which the sales were made \* \* \*.

All \* \* \* *records* \* \* \* shall be and remain the *property of [Underwood]* \* \* \*." (Emphasis added.)

"(k) *Furnish* to [Underwood] \* \* \* each month, a \* \* \* *detailed statement* of all *unsold* product \* \* \*." (Emphasis added.)

"(m) Pay all his own expenses \* \* \*."

"(n) Accept full and exclusive liability for the payment of any and all taxes, contributions or other sums payable for unemployment compensation or insurance and old age retirement benefits * * *."

"(o) Have all *checks* and *drafts* * * * of money due [Underwood] * * * made *payable to [Underwood]* * * * and report and remit daily by check * * * made payable to the order of [Underwood] * * * all moneys received or collected by him and due [Underwood] * * *." (Emphasis added.)

"(q) * * * [U]*pon the termination* of this agreement or upon request at any time by [Underwood] * * * *deliver to [Underwood]* * * * any product * * * belonging to [Underwood] * * *." (Emphasis added.)

"(t) Be *responsible* for the *depreciation, loss, damage* * * * or *theft* of product delivered to him for demonstration, sale or stock." (Emphasis added.)

Paragraph 5(d) of Schedule "A" requires the Sales Agent to purchase at the trade-in allowance all used trade-ins with certain exceptions.

Paragraph 1(a) of Schedule "B" fixes the commission rates and Paragraph 1(b) of Schedule "B" provides that:

"(b) Machines sold at a discount or with an overallowance on a trade-in to be retained by [Underwood] * * * —commission will be calculated by deducting all such discounts and overallowances from the amount listed in 1(a) above." [i. e., commissions]

Plaintiff asserts that numerous illegal limitations and restraints are imposed upon it by the Sales Agreement and its schedules. Article 3 of the Agreement provides:

"3. The Sales Agent shall:

* * * * *

"(h) *Adhere strictly to the selling prices*, terms and conditions fixed by the Corporation for the product, without increase, reduction, discount or rebate." (Emphasis added.)

"(u) *Not sell* any new merchandise which is *in competition* with the product." (Emphasis added.)

Schedule "A" provides:

"3. The Sales Agent's *territory* * * * is *exclusive* * * *. The Corporation reserves the right to change at its discretion the Sales Agent's territory for any of his products, including the right to exclude specific customers or classes of customers from the territory * * *." (Emphasis added.)

"4. (a) The Sales Agent *agrees to refrain* from making *sales* to customers *outside his territory*. Any sales made in violation of this provision will result in the full commission being charged back and termination of this agreement by the Corporation." (Emphasis added.)

"(b) In a case where the Sales Agent makes a sale to a customer having its principal place of business in his territory, but the product is to be delivered to an office of the customer located outside said territory, the Sales Agent * * *. [W]ill receive 40% of the commission * * *."

"(c) In a case where a customer transfers the product purchased from the Sales Agent to a different territory, 60% of the commission will be charged back against the commission account of the Sales Agent who made the sale. * * *"

Paragraph 5 of Schedule "A" provides that Underwood's Price Book sets forth the authorized trade-in allowance on used machines.

Paragraph 1(a) of Schedule "B" fixes monthly sales quotas for Underwood (1) standard and (2) electric typewriters, and for Olivetti (3) adding and (4) calculating machines. Article 5 of the Agreement provides that:

" * * *

"The Corporation may terminate the agreement forthwith * * * in the event that:

* * * * *

"(e) the Sales Agent fails during any one-month period to achieve his *quota of sales* for said period." (Emphasis added.)

Before any determination can be reached as to the validity or invalidity of the Sales Agreement as alleged, it is first necessary to determine the legal relationship created between the parties by that agreement. Underwood contends that the Sales Agreement created a valid agency relationship, whereas CBS contends that the agreement was sham and spurious and that the designation of CBS as an agent was a mere form without substance.

The principal determinative of an agency relationship as laid down by the courts is whether full title and dominion over the goods is in fact retained by the principal, and whether the agent is empowered by the agreement to deal with the goods in a manner inconsistent with the asserted retention of ownership of these goods by the principal. The courts' conclusion with respect to the application of these criteria is based on their examination of the entire relationship between the parties. Thus no single feature of that relationship can be regarded as determinative by itself. See United States v. General Elec. Co., 272 U.S. 476, 484, 47 S.Ct. 192, 71 L.Ed. 362 (1926); Federal Trade Comm'n v. Curtis Publishing Co., 260 U.S. 568, 581–582, 43 S.Ct. 210, 67 L.Ed. 408 (1923); Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 354, 42 S.Ct. 360, 66 L.Ed. 653 (1922); Western Fruit Growers Sales Co. v. Federal Trade Comm'n, 322 F.2d 67, 68–69 (9th Cir. 1963), cert. denied, 376 U.S. 907, 84 S.Ct. 661, 11 L.Ed.2d 606 (1964); Students Book Co. v. Washington Law Book Co., 98 U.S.App.D.C. 49, 232 F.2d 49, 53 (1955), cert. denied, 350 U.S. 988, 76 S.Ct. 474, 100 L.Ed. 854 (1956); Mathews Conveyer Co. v. Palmer-Bee Co., 135 F.2d 73 (6th Cir. 1943).

Agency relationships created by manufacturers for the sale of their products, on terms identical in almost every material respect to those of Underwood have been sustained by the courts as creating genuine sales agencies. Thus in Federal Trade Comm'n v. Curtis Publishing Co., 260 U.S. 568, 43 S.Ct. 210, 67 L.Ed. 408 (1923), Curtis appointed 1,535 agents throughout the country to sell its full line of magazines and other publications. Each agent was assigned a specific territory in which to operate. He was obligated to devote all necessary time to the sale of his principal's products, was assigned specific sales quotas to fill and required not to handle competitive publications. Curtis publications were delivered to him on consignment; he received a commission on sales effected by him and all unsold publications were to be returned to Curtis. Furthermore, Curtis' agents were required to post in advance an indemnity against magazines not returned by them—a device not present in this case.

It was argued that Curtis' distribution arrangements operated in reality as a sale and were designed to avoid the impact of the anti-trust laws. The government cited in support of its argument the fact that Curtis' agents were independent merchants, and that Curtis had, prior to the initiation of this agency distribution arrangement, dealt with many of these same companies as seller and not as principal.

The Supreme Court upheld Curtis' distribution arrangements as valid agencies, stating:

"The engagement of the competent agents obligated to devote their time and attention to developing the principal's business, to the exclusion of all others, where nothing else appears, has long been recognized as proper and unobjectionable practice. The evidence clearly shows that respondent's agency contracts were made without unlawful motive and in the orderly course of an expanding business. * * *

"*  *  *  The mere selection of competent, successful and exclusive representatives in the orderly course of development can give no just cause for complaint, and, when standing alone, certainly affords no ground for condemnation  *  *  *."

(Id. at 581–582, 43 S.Ct. at 213.)

The Curtis case was followed three years later by United States v. General Elec. Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), in which the government sought to challenge as illegal under the anti-trust laws adoption of an agency system used by General Electric for the distribution of its lamps. By stipulation of the parties, the sole issue presented to the Court was whether General Electric's agency arrangements were *bona fide*, whether the consignment of General Electric's lamps to more than 21,000 agents was genuine and whether title remained in the consignor until sale and delivery to the ultimate consumer.

The Supreme Court held that General Electric's agency consignment system was genuine in all respects.

The terms of General Electric's agency contracts have the same essential attributes of agency as do Underwood's:

1. The agent, appointed as GE's sales agent for a period of one year, renewable at the agent's option, was obligated to devote his best efforts to the sale of GE's lamps. (See Article 1 of Underwood Agreement.)

2. GE expressly reserved title to its lamps which were delivered to the agent on consignment and were to be returned to GE upon termination of the agency. (See Article 2, Sections (b) and (c); Article 3, Sections (f), (g), (i), (j), (k), (o), and (q) of Underwood Agreement.)

3. The agent received a commission on each sale effected by him and assumed all expenses of the agency except the original transportation costs which were paid by GE. (See Article 2, Sections (a) and (c); Article 3,

Sections (a), (b), (d) and (m) of Underwood Agreement.)

4. Sales prices were fixed by GE and the agent began his relationship with GE with an inventory stipulated in the consignment order. Sales from this stock would be made, followed by replacement orders which were charged to the agent's consignment account. Monthly accountings were usually rendered. (See Article 3, Sections (h), (i), (j), (k) and (o) of Underwood Agreement.)

5. GE, as did Underwood, paid all personal property taxes on the agent's inventory. Although Article 3, Section (t) of the Underwood Agreement provided that the Sales Agent would be "responsible for the depreciation, loss, damage  *  *  *  or theft of product delivered to him for demonstration, sale or stock", Underwood insured against the loss of inventories in the hands of Sales Agents attributable to burglary, theft, strikes, riots, civil commotion and direct loss by aircraft, while the Sales Agents insured against fire, lightning, smoke damage, explosion, water and sprinkler, earthquake, flood and vehicle damage. Although the GE plan contained "no specific agreement to this effect, the company  *  *  *  assumed all risk of fire, flood, obsolescence, and price decline, and carrie[d] whatever insurance is carried on the stock of lamps in the hands of its agents  *  *  *." (272 U.S. at 483, 47 S.Ct. at 194.)

Article 3, Section (k) requires the Sales Agent to "account to [Underwood]  *  *  *  in cash for any loss of said product, irrespective of the cause of such loss, for which the Sales Agent will be responsible." But, as stated in GE:

"There is no conflict in the agent's obligation to account for all lamps lost, missing, or damaged in the stock. It is only a reasonable provision to secure his careful handling of the goods intrusted to him." (272 U.S. at 484, 47 S.Ct. at 195.)

After analyzing the operation and effect of GE's agency agreements, the Court concluded that they created true agencies and were not a subterfuge designed to circumvent an earlier consent decree prohibiting GE from fixing the resale prices of its lamps after their sale to retailers. The Court stated, and the statement is particularly helpful because of the specific standards established for evaluating the *bona fides* and validity of an agency:

"We find nothing in the form of the contracts and the practice under them which makes the so-called B and A agents anything more than genuine agents of the company, or the delivery of the stock to each agent anything more than a consignment to the agent for his custody and sale as such. *He is not obligated to pay over money for the stock held by him until it is sold.* As he guarantees the account when made, he must turn over what should have been paid whether he gets it or not. This term occurs in a frequent form of pure agency known as sale by *del credere* commission. *There is no conflict in the agent's obligation to account for all lamps lost, missing, or damaged in the stock. It is only a reasonable provision to secure his careful handling of the goods intrusted to him.* We find nothing in his agreement to pay the expense of storage, cartage, transportation (except the freight on the original consignment), handling and the sale and distribution of the lamps, inconsistent with his relation as agent. *The expense of this is of course covered in the amount of his fixed commission.* The agent has no power to deal with the lamps in any way inconsistent with the retained ownership of the lamps by the company. When they are delivered by him to the purchasers, *the title passes directly from the company to those purchasers.* There is no evidence that any purchaser from the company or any of its agents

is put under any obligation to sell at any price, or to deal with the lamps purchased except as an independent owner. *The circumstance that the agents were in their regular business wholesale or retail merchants, and under a prior arrangement had bought the lamps and sold them as their owners, did not prevent a change in their relation to the company.* We find no reason in this record to hold that the change in this case was not in good faith and actually maintained." (Id. at 484–485, 47 S.Ct. at 195.) (Emphasis added.)

With respect to the important element of title to inventory, Underwood has consistently operated under its Sales Agreements as the owner of the machines consigned to its agents, and such ownership has been sustained when challenged. Underwood's auditors, Price Waterhouse & Co., have always included in their statements of Underwood assets the inventories of Underwood products in the custody of its agents. Likewise, in both State and Federal court proceedings, Underwood's title in and right to possession of machines in the custody of its agents, has been recognized as against creditors of the agent, and against a Federal tax lien applicable to a selling agent's property. In criminal cases, the courts have held agents criminally liable for conversion of machines consigned to them by Underwood. Also, whenever state or local governments impose personal property taxes on inventories in the custody of Underwood's sales agents, Underwood uniformly pays these taxes when assessed against Underwood or where the agent notifies Underwood of an assessment against him.

CBS asserts that under the Underwood agreement CBS was not a true agent because: (a) it is an "independent businessman" recognized as such by Underwood; (b) its customers are not specifically informed by it that it is not the owner of the goods; (c) it is required to perform certain work on the products before they are delivered to a customer;

and (d) it acted "solely for its own benefit and was the purchaser of the products involved" (Plaintiff's Brief at 23–29).

The fact that CBS is an "independent businessman" has been rejected by the Supreme Court on two separate occasions as impinging in any way on the issue of the genuineness of the agency. See United States v. General Elec. Co., 272 U.S. at 484–485, 47 S.Ct. at 194–195; Federal Trade Comm'n v. Curtis Publishing Co., 260 U.S. at 581–582, 43 S.Ct. at 213. No case has been cited by either party or found by the Court which supports plaintiff's contention, and since an agent, by terminology, is not an employee, it is difficult to see what else he could be but an "independent businessman".

CBS claims, but does not assert as a material fact, that the agent must be regarded as a purchaser because it acts for its own benefit, performs "work" on the machines and does not inform its customers that it is not the owner of the goods. These assertions merit little comment. In the first place, whether CBS unilaterally attempted to conceal the fact of its agency is obviously unimportant. Of importance is the fact that the contract with the agent required him to secure the signature of each purchaser to the Underwood sale contract. This contract form carries the Underwood heading in letters three times the size of the rest of the type, and specifies that the contract must be approved by Underwood. Also, all collections and billings are performed by Underwood. The customer is therefore certainly informed that Underwood is the owner and seller of the goods.

The "work" performed by an agent, which plaintiff argues defeats the agency relationship, consists of taking the new office machine out of its box, removing the bracket or board or screw attached to permit the machine's safe transit, and making sure there has been no damage in transit. Each machine sent to an agent is tested, in actual operation, before leaving the factory. It is fully assembled and in operating condition, except for packing attachment, when received by the agent. The attempt to give the impression that agents were required to or had as a regular part of their duty the manufacture or assembly of machines is thus contrary to fact.

As to the agent's working for himself, suffice it to say that every agent works for himself in the sense of working to earn his commission. But here and in other true agency cases he makes the sale of a product owned by his principal, in the name of, for the account of, in accordance with terms specified by, his principal, here Underwood, and Underwood collects the full purchase price.

All plaintiff's other arguments respecting the agent's obligation to charge a specific price, its "possession" of the goods, its obligation to bear certain inventory property risks while in its custody and to bear the expenses of the selling representatives it employed, have all been considered by the courts and specifically rejected by them as factors which detracted in any way from the validity of the agency.

As the Supreme Court observed in the Curtis and GE cases, supra, what is determinative is whether the agent is entitled or enabled to act toward the goods as the real owner. Clearly the Underwood agent is not permitted so to act. The agent is not entitled to enter into the contract of sale, or to bill the ultimate purchaser. He has no power or authority to collect the purchase price, extend the time for payment, or in any other way compromise or settle the account. The entire risk of payment and also therefore the control over collection is on Underwood. Not even a *del credere* or security deposit arrangement, such as the Court sanctioned in GE and Curtis, is to be found under the Underwood Sales Agreement. Similarly, CBS is required to account in detail to Underwood for its inventory, and must on demand report to Underwood on the sales efforts which it makes on behalf of Underwood.

Finally, as stated above, express provision is made for return of all inventory on termination of an agent's appointment.

From the foregoing it is apparent that the Underwood Sales Agency Agreement does create an agency which meets the concept of agency outlined in Restatement (Second), Agency § 14J (1958). CBS did not act for its own benefit but for the benefit of its principal, Underwood. This is clear from the provision of the Sales Agency Agreement. In addition, an examination of the seven specific indicia of a sale which the Restatement suggests as a guide supports the finding that an agency status was created.

First, as a consignee, the agent did not get legal title to the inventory, nor even terminate Underwood's right to possession of the inventory. (Compare Restatement (Second), Agency § 14J, comment b(1) (1958)).

Second, the consignee never became responsible for the price, either on delivery of the inventory to him, or upon sale of the inventory to purchasers. (Id. comment b(2).)

Third, the agent had no authority to fix the price without accounting to Underwood and, in fact, all payments were to be made directly to Underwood from the ultimate purchaser. (Id. comment b(3).)

Fourth, the goods delivered to the agent were not incomplete and the agent was not intended to make additions to them or "complete the process of manufacture." (Id. comment b(4).)

Fifth, insurance against certain risks of loss was carried by Underwood, although the Supreme Court in GE, supra, 272 U.S. at 484, 47 S.Ct. at 195, said that an agent's obligation to account for missing or damaged stock was "only a reasonable provision to secure his careful handling of the goods intrusted to him," and not in conflict with agency status. (Id. comment b(5).)

Sixth, the Underwood agent did not have the right to deal in the goods of persons other than Underwood to the extent they competed with the Underwood products assigned to him; even so, the Supreme Court in GE, supra, expressly approved the lamp agencies, although the agents dealt in other products. (Id. comment b(6).)

Seventh, the Underwood agent does not deal in his own name and is obliged to disclose to purchasers that the goods are those of another. (Id. comment b(7).)

Plaintiff asserts that by reason of the provisions in Paragraph 1(b) of Schedule "B" it was at all times responsible for an agreed price since, in calculating its commission, over-allowances on trade-ins or discounts on sales by it were deducted and that accordingly plaintiff and the other sales agents were acting solely for their own benefit in granting discounts or over-allowances. However, under the Sales Agreement Underwood "reserves the right in its unrestricted discretion to determine whether an order is acceptable or not." (Paragraph 12, Schedule "A", of Agreement). In addition, since the granting of discounts or over-allowances results in reducing the commissions payable, it would appear that CBS would be acting not solely for its benefit in granting them but solely to its detriment. In either event, Underwood receives the specified price on a net basis.

Furthermore, there are persuasive reasons to justify such a method of sales distribution. Although I make no finding thereon, Underwood argues that the use of sales agents to market its products is based on a long-standing policy dictated by business and market factors, that its major products, consisting of standard and electric typewriters, adding machines and calculators, are sold primarily through placement of such machines with customers for trial. Underwood estimates that it takes an inventory of five machines on trial to effect one sale, and that the average dealer or individual desiring to start in business as a dealer lacks the capital to provide and maintain a sufficient inventory. In addition, it argues that under the Sales Agreement, all credit risks on the sale of machines to customers in excess of the agent's commission are assumed by Underwood, relieving the agents of credit operations and leaving them relatively as free as the salesmen-employees in Un-

derwood's branches to devote their energies and attention to selling. It further argues that an agency relationship, through which the agents represent all of Underwood's major products, contributes both efficiency and loyalty to the distribution of the products, and that such distribution is also affected by Underwood's ability to provide adequate servicing and repair through its sales outlets. (Underwood does in fact give an eight-weeks' training course without charge to the agent's servicemen, which expense, it argues, would not be justified if the agent lacked loyalty to Underwood and devoted his efforts to competing lines of products.)

■ If, as the Court finds, the Sales Agreement is an agency contract, and not a contract of sale upon condition, this would appear to dispose of the charge of illegality under Section 3 of the Clayton Act. (38 Stat. 731 (1914), 15 U.S.C. § 14 (1963).) Federal Trade Comm'n v. Curtis Publishing Co., 260 U.S. 568, 581, 43 S.Ct. 210, 67 L.Ed. 408 (1923).[1] It does not, however, dispose of the charge of illegality under Section 1 of the Sherman Act (26 Stat. 209 (1890), as amended, 50 Stat. 693 (1937), 15 U.S.C. § 1 (1963)). See Simpson v. Union Oil Company, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942).

It is true, of course, that GE, supra, involved Sherman Act violations. But while GE may still be persuasive in determining whether an agency relationship exists under particular circumstances, it would not appear to be authority for the validity of such agency contracts under the Sherman Act except possibly in the case of patented articles.

In Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964),[2] the Supreme Court has given validity to

the argument, rejected in GE, that "the system of distribution is so complicated and involves such a very large number of agents, distributed throughout the entire country, that the very size and comprehensiveness of the scheme brings it within the Anti-Trust Law." United States v. General Elec. Co., 272 U.S. at 485, 47 S.Ct. at 195.

■ Does the fact that the product which is distributed is a patented article, with the patent held by the distributor, alter the situation? GE said that it did not make any difference (272 U.S. at 488, 47 S.Ct. at 196), although Mr. Justice Douglas, in Union Oil, believed this fact to be the *ratio decidendi* of GE distinguishing it from Union Oil (377 U.S. at 24, 84 S.Ct. at 1058). However, a patent does not give the patentee any exemption from the provisions of the Sherman Act beyond the limits of the patent monopoly. United States v. Line Material Co., 333 U.S. 287, 308, 68 S.Ct. 550, 92 L.Ed. 701 (1948); see United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Although Mr. Justice Douglas referred to the "consignments" in Union Oil in quotes, I do not read his opinion as a determination that a true agency in legal definition did not exist between Union Oil and its consignees, but rather that if such agency offends the anti-trust laws it will not be accorded the status it might otherwise receive. If a sale on condition and not an agency was involved in Union Oil, it would have clearly been illegal even though a patented product was involved, (Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852 (1940); Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107 (1912); cf., Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55

---

1. Such cases involving the Clayton Act as Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653 (1922), are not to the contrary since the existence of a contract of *sale* was adjudicated.

2. For an excellent analysis and discussion of the Union Oil case, see Handler, Recent Antitrust Developments—1964, 63 Mich.L.Rev. 59 (1964).

L.Ed. 502 (1911)) and there would have been no need to distinguish GE.

It seems clear, therefore, that Union Oil, under the particular facts therein involved, attached illegality *per se* to consignment contracts not involving patented articles. It does so by refusing to call a "consignment" an agency if by doing so a supplier would be able to impose non-competitive prices on thousands of persons who otherwise might be competitive. Although I would limit such holding to the particular facts of that case, I would hesitate to reach the corollary conclusion that a consignment contract involving a patented article is legal *per se* under the Sherman Act. Such a holding is certainly not required by Union Oil. However, neither does Union Oil require the holding that such a contract is illegal *per se*.

Although, as Mr. Justice Stewart has indicated in his dissenting opinion, Union Oil may have overruled General Electric (377 U.S. at 25, 29, 84 S.Ct. at 1059, 1061), I am unwilling to believe that it constitutes a holding that consignment agreements are *per se* illegal under the Sherman Act, and that the existence of such a consignment agreement and nothing more requires the entry of a summary judgment. I prefer to let Union Oil stand on its own particular facts and reserve decision on any other type of consignment agreement or, in fact, any other consignment agreement until all of the pertinent facts are before me and are uncontroverted, which is not the case on the present record.

In the present case, while the products consigned were patented, Underwood was not, in all cases, the patentee, certain patents belonging to Olivetti. It would appear that the typewriters were covered by Underwood patents and that the adding, multiplying and accounting machines and printing calculators were covered by Olivetti patents. An affidavit setting forth the respective patents was furnished the Court by Underwood subsequent to the hearing of these motions. Underwood argues that the fact that some of the products sold by it under the Sales Agreement were under patents owned by Olivetti cannot affect the applicability of the rule in GE as interpreted in Union Oil. It is conceded that by July 1, 1960 (prior to the execution of the Sales Agreement herein) Olivetti had acquired 65 percent of the stock of Underwood, and Underwood had acquired all of the assets of Olivetti America, including all of the stock of Olivetti Sales, and had acquired the right to distribute Olivetti products in the United States. The terms of acquisition of such distribution right are not before the Court on this motion. Underwood's rights in such patents, or the nature of such patents, cannot be determined on the record before the Court. A patentee cannot extend his patent controls to unpatented articles by way of tie-in sales or otherwise. Clearly the existence and extent of any rights in the Olivetti patents and the nature of the Underwood patents are material issues in the present posture of this case and constitute genuine issues to be tried.

There are additional issues that remain unresolved. Mr. Justice Douglas repeatedly refers to the "coercive" type of agreement involved in Union Oil. The question of "coercion" is contested between the parties to the Sales Agreement herein.

Accepting the conclusion of Mr. Justice Stewart as set forth in his dissenting opinion in Union Oil, that that case has overruled General Electric, I also note his statement that the root error in that case was the district court's decision to terminate the controversy by way of a summary judgment, and his opinion that there should be a full trial of all the issues in that litigation. I further note that both Mr. Justice Brennan and Mr. Justice Goldberg felt that there should be a trial of the question involving the coercive aspects of the agreement involved. In the present case, CBS dealt in the products of many other manufacturers and there is serious dispute between the parties whether CBS was coerced into entering into the Sales Agreement or whether it did so willingly

426

and without any pressure being brought to bear upon it by Underwood.

Even defendant's motives in the use of the distribution method herein involved, while possibly not material, is disputed. In their statements under Rule 9(g) of the General Rules of this Court, there is "substantial dispute" as to the "material facts regarding which there is no genuine issue to be tried." The record is singularly lacking with regard to the relevant facts respecting the nature of the market in which defendant is operating, the proportion of defendant's business herein involved, and the practical effect of any vertical agreement between the parties hereto with reference to territorial and customer restrictions.

If what exists here is a vertical agreement between Underwood and the sales agents containing territorial and customer restrictions, it should not be held illegal *per se* on the basis of the incomplete and controverted record presently before this Court. See White Motor Co. v. United States, 372 U.S. 253, 255, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

Plaintiff alleges coercive price maintenance in areas not covered by the Sales Agreement but which could bear on the validity of the agreement. There is serious dispute as to the existence of competition between the parties to the agreement.

The sales practices of Underwood over the years, its reliance on the authority of the General Electric case, supra, and its motives and the considerations involved in the method of distribution involved herein are all matters which should properly be left to the trial court and not determined by the Court on a motion of this nature. This is particularly so in determining whether any liability should be imposed retroactively in this case. See Lyons v. Westinghouse Elec. Co., 235 F.Supp. 526 (S.D.N.Y. 1964).

It is noted that under the majority opinion of Mr. Justice Douglas the question whether the rule announced in Union Oil would be applied prospectively was reserved until all the facts became known (377 U.S. at 25, 84 S.Ct. at 1059). I do not believe that it is possible to say that all the material facts are known in the present case. Accordingly, even were the agreement illegal *per se,* the imposition of damages or the computation of damages would not automatically follow on the basis of the record before the Court.

 Accordingly, in view of the Court's holding herein that, on the record before it, the Sales Agreement is not illegal *per se,* the motions for summary judgment herein are denied.

Settle order on notice.